## DEPARTMENT OF SOCIAL SERVICES *v.* EDITH A. SAUNDERS, CONSERVATRIX (ESTATE OF JAMES A. SAUNDERS III)
### (SC 15903)

Callahan, C. J., and Borden, Berdon, Norcott, Katz, Palmer and McDonald, Js.

Argued October 27, 1998—officially released February 16, 1999

*W. Bradley Kellogg*, with whom was *Kevin M. O'Grady*, for the appellant (defendant).

*Hugh Barber*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Richard J. Lynch*, assistant attorney general, for the appellee (plaintiff).

*Keith B. Gallant, Lisa N. Davis* and *Brock T. Dubin* filed a brief for the Connecticut Bar Association as amicus curiae.

*Opinion*

KATZ, J. The sole issue on appeal is whether the Probate Court was authorized to permit a conservatrix to establish an irrevocable inter vivos trust funded with the net proceeds recovered in the settlement of a negligence action filed on her ward's behalf, which would not be considered an available resource for the purpose of determining ongoing medicaid eligibility. We conclude that the Probate Court was so authorized.

The following relevant facts were set forth in affidavits submitted by both parties in support of their competing motions for summary judgment. In 1983, the defendant, Edith A. Saunders, was appointed conservatrix of the person and estate of her son, James A. Saunders III (Jamie), by the Probate Court for the district of Newtown. The appointment was made as a result of a motor vehicle accident that caused Jamie to suffer impairment of his mental and intellectual functions, as well as neurological deficits affecting his speech, hearing, balance and gait. Since 1983, due to his permanent and total disability, Jamie has been the recipient of benefits under the Title XIX Medicaid Program (medicaid), which is administered in Connecticut by the state department of social services (department), and has resided in long-term care facilities and rehabilitation centers with his care funded by medicaid.[1]

In 1989, Jamie was a resident patient at the New Medico/High Watch Rehabilitation Center in New Hampshire, undergoing rehabilitation for the injuries suffered in the motor vehicle accident, when he fell down a flight of stairs at a residential unit on the premises. Immediately thereafter, Jamie was taken to Huggins Hospital in Wolfeboro, New Hampshire, which, despite Jamie's temporary loss of consciousness and temporary paralysis, neglected to take cervical X rays. Following his release from Huggins Hospital, Jamie's condition deteriorated, resulting in his being transported by ambulance to the Memorial Hospital in North

---

[1] The federal statutes relating to medicaid are codified at 42 U.S.C. § 1396a et seq. Authorization to the commissioner of social services to participate in the medicaid program is found at General Statutes § 17b-260 et seq.

At the time of the settlement agreement and the proposed establishment of the trust in this case, the 1993 revision of the General Statutes governed. Since that time, only minor technical changes were made in addition to certain sections being transferred and renumbered. No substantive changes have been made to the relevant statutes. For purposes of clarity, therefore, references throughout this opinion are to the current (1997) revision.

Conway, New Hampshire, where X rays revealed fractures to his cervical spine. He was then transferred to the Maine Medical Center, where he underwent a surgical procedure known as cervical fusion. As a consequence of these events, Jamie, who was rendered a quadriplegic for an extended period of time, has a substantial and permanent impairment to his upper and lower extremities, leaving him unable to walk without assistance or to perform the functions normally associated with healthy arms, shoulders and hands.

Saunders thereafter commenced an action in the United States District Court for the District of New Hampshire against Huggins Hospital, the physician who had examined Jamie, and Medico/High Watch Rehabilitation Center alleging, inter alia, medical negligence and negligent care and supervision. In 1994, a settlement agreement was reached that provided for those named defendants to pay Saunders, as Jamie's conservatrix, $1,800,000. The enforceability of the settlement was conditioned upon the approval of the Probate Court for the district of Newtown. Saunders applied to the Probate Court to compromise the claim for an aggregate gross settlement of that amount with the following proposed distribution: $600,000 for attorney's fees; $40,351.95 for the costs of bringing the action; and $579,824.03 for reimbursement to the state of Connecticut in discharge of its lien on the settlement proceeds acquired pursuant to General Statutes § 17b-94.[2] This left $579,824.02 as net settlement proceeds.

[2] General Statutes § 17b-94 (formerly § 17-83f) provides: "State's claim against proceeds of cause of action. Assignment of interest in estate to the state. (a) In the case of causes of action of beneficiaries of aid under sections 17b-22, 17b-75 to 17b-77, inclusive, 17b-79 to 17b-103, inclusive, 17b-114, 17b-180 to 17b-183, inclusive, 17b-260 to 17b-262, inclusive, 17b-264 to 17b-285, inclusive, 17b-357 to 17b-362, inclusive, 17b-600 to 17b-604, inclusive, 17b-807 and 17b-808, subject to subsections (b) and (c) of section 17b-93, or of a parent of a beneficiary of the aid to families with dependent children program, the claim of the state shall be a lien against the proceeds therefrom in the amount of the assistance paid or fifty per cent of the proceeds received

As part of her amended application to compromise and settle Jamie's claim, Saunders requested that the net settlement amount be placed in an irrevocable supplemental needs trust (trust) for Jamie's benefit. According to the applications, the proposed trust would

by such beneficiary or such parent after payment of all expenses connected with the cause of action, whichever is less, for repayment under section 17b-93, and shall have priority over all other claims except attorney's fees for said causes, expenses of suit, costs of hospitalization connected with the cause of action by whomever paid over and above hospital insurance or other such benefits, and, for such period of hospitalization as was not paid for by the state, physicians' fees for services during any such period as are connected with the cause of action over and above medical insurance or other such benefits; and such claim shall consist of the total assistance repayment for which claim may be made under the provisions of sections 17b-22, 17b-75 to 17b-77, inclusive, 17b-79 to 17b-103, inclusive, 17b-114, 17b-180 to 17b-183, inclusive, 17b-260 to 17b-262, inclusive, 17b-264 to 17b-285, inclusive, 17b-357 to 17b-362, inclusive, 17b-600 to 17b-604, inclusive, 17b-807 and 17b-808. The proceeds of such causes of action shall be assignable to the state for payment of the amount due under said section 17b-93, irrespective of any other provision of law. Upon presentation to the attorney for the beneficiary of an assignment of such proceeds executed by the beneficiary or his conservator or guardian, such assignment shall constitute an irrevocable direction to the attorney to pay the Commissioner of Administrative Services in accordance with its terms, except if, after settlement of the cause of action or judgment thereon, the Commissioner of Administrative Services does not inform the attorney for the beneficiary of the amount of lien which is to be paid to the Commissioner of Administrative Services within forty-five days of receipt of the written request of such attorney for such information, such attorney may distribute such proceeds to such beneficiary and shall not be liable for any loss the state may sustain thereby.

"(b) In the case of an inheritance of an estate by a beneficiary of aid under sections 17b-22, 17b-75 to 17b-77, inclusive, 17b-79 to 17b-103, inclusive, 17b-114, 17b-180 to 17b-183, inclusive, 17b-260 to 17b-262, inclusive, 17b-264 to 17b-285, inclusive, 17b-357 to 17b-362, inclusive, 17b-600 to 17b-604, inclusive, 17b-807 and 17b-808, subject to subsections (b) and (c) of section 17b-93, fifty per cent of the assets of the estate payable to the beneficiary or the amount of such assets equal to the amount of assistance paid, whichever is less, shall be assignable to the state for payment of the amount due under section 17b-93. The Court of Probate shall accept any such assignment executed by the beneficiary and filed by the Commissioner of Administrative Services with the court prior to the distribution of such inheritance, and to the extent of such inheritance not already distributed, the court shall order distribution in accordance therewith. If the Commissioner of Administrative Services receives any assets of an estate pursuant to any such assignment,

provide for Jamie's supplemental needs during his lifetime. The department was named the remainderman of the trust estate upon Jamie's death.[3] The terms of the proposed trust were drafted in conformity with the specifications of 42 U.S.C. § 1396p (d) (4) (A)[4] in an attempt to ensure that the value of the trust would not be considered an available resource for the purpose of determining ongoing medicaid eligibility and, therefore, would not adversely affect Jamie's eligibility to continue receiving medicaid benefits.

Following a hearing in February, 1994, the Probate Court approved the settlement, conditioned upon Saunders placing the net settlement proceeds in a restricted account pending a hearing at which the approval for the establishment of a trust would be determined. The department stipulated that it would not consider the amount held in the restricted account in determining Jamie's continued eligibility for Title XIX medical assistance benefits until such time as the Probate Court ruled on Saunders' request to create the trust.

In April, 1994, a hearing was held in the Probate Court to address that part of Saunders' amended application

the commissioner shall be subject to the same duties and liabilities concerning such assigned assets as the beneficiary."

[3] Article 5 A of the trust instrument provides that, upon Jamie's death, the trustees "shall pay first to the State of Connecticut and only thereafter to any other State of the United States which has a claim for medical assistance payments made on [Jamie's] behalf, all of such claim to the extent required by law up to the entire amount remaining in said trust at [his] death. . . ."

[4] Title 42 of the United States Code § 1396p (d) (4) (A) defines a trust, the value of which will not be considered in determining medicaid eligibility, as follows: "A trust containing the assets of an individual under age 65 who is disabled (as defined in [42 U.S.C. § 1382c (a) (3)] and which is established for the benefit of such individual by a parent, grandparent, legal guardian of the individual, or a court if the State will receive all amounts remaining in the trust upon the death of such individual up to an amount equal to the total medical assistance paid on behalf of the individual under a State plan under this title [42 U.S.C. § 1396 et seq.]."

seeking authorization to establish the trust as part of the settlement of the estate's negligence claim. The department objected to the creation of the trust, claiming that: (1) Saunders is not authorized to establish the trust and the Probate Court is not authorized to approve the funding of the trust with the net settlement proceeds of the negligence claim; and (2) the department had not consented, pursuant to General Statutes § 17b-85, formerly § 17-82j,[5] to the proposed disposition of Jamie's assets.

Citing to General Statutes § 45a-655 (e),[6] and 42 U.S.C. § 1396p (d) (4) (A), the Probate Court approved Saunders' application to create an irrevocable supplemental

[5] General Statutes § 17b-85 (formerly § 17-82j) provides: "Notice by beneficiary of receipt of property, transfer or encumbrance of property or change in information previously furnished. If any person receiving an award for the care of any dependent child or children, or any person legally liable for the support of such child or children, or any other person being supported wholly or in part under the provisions of sections 17b-22, 17b-75 to 17b-77, inclusive, 17b-79 to 17b-103, inclusive, 17b-114, 17b-180 to 17b-183, inclusive, 17b-260 to 17b-262, inclusive, 17b-264 to 17b-285, inclusive, 17b-357 to 17b-362, inclusive, 17b-600 to 17b-604, inclusive, 17b-807 and 17b-808 or any beneficiary under said sections or any legally liable relative of such beneficiary, receives property, wages, income or resources of any kind, such person or beneficiary, within ten days after obtaining knowledge of or receiving such property, wages, income or resources, shall notify the commissioner thereof, orally or in writing, unless good cause is established for failure to provide such notice, as determined by the commissioner. No such person or beneficiary shall sell, assign, transfer, encumber or otherwise dispose of any property without the consent of the commissioner. The provisions of section 17b-137 shall be applicable with respect to any person applying for or receiving an award under said sections. Any change in the information which has been furnished on an application form or a redetermination of eligibility form shall also be reported to the commissioner, orally or in writing, within ten days of the occurrence of such change, unless good cause is established for failure to provide such notice, as determined by the commissioner."

[6] General Statutes § 45a-655 (formerly § 45-75) provides: "Duties of conservator of the estate. Application for distribution of gifts of income and principal from the estate. (a) A conservator of the estate appointed under section 45a-646, 45a-650 or 45a-654 shall, within two months after the date of his or her appointment, make and file in the Court of Probate, an inventory under oath of the estate of his or her ward, with the properties thereof

needs trust for Jamie's benefit and to fund the trust

appraised or caused to be appraised, by such conservator, at fair market value as of the date of his appointment. Such inventory shall include the value of the ward's interest in all property in which the ward has a legal or equitable present interest, including, but not limited to, the ward's interest in any joint bank accounts or other jointly held property. The conservator shall manage all the estate and apply so much of the net income thereof, and, if necessary, any part of the principal of the property, which is required to support the ward and those members of the ward's family whom he has the legal duty to support and to pay his debts, and may sue for and collect all debts due the ward.

"(b) Any conservator of the estate of a married person may apply such portion of the property of the ward to the support, maintenance and medical treatment of the ward's spouse which the Court of Probate, upon hearing after notice, decides to be proper under the circumstances of the case.

"(c) Notwithstanding the provisions of section 45a-177, the court may, and at the request of any interested party shall, require annual accountings from any conservator of the estate and the court shall hold a hearing on any such account with notice to all persons entitled to notice under section 45a-649.

"(d) In the case of any person receiving public or medical assistance in accordance with the provisions of sections 17b-22, 17b-75 to 17b-77, inclusive, 17b-79 to 17b-103, inclusive, 17b-114, 17b-180 to 17b-183, inclusive, 17b-260 to 17b-262, inclusive, 17b-264 to 17b-285, inclusive, 17b-357 to 17b-362, inclusive, 17b-600 to 17b-604, inclusive, 17b-807 and 17b-808, the conservator of the estate shall apply toward the cost of care of such person any assets exceeding limits on assets set by statute or regulations adopted by the Commissioner of Social Services. Notwithstanding the provisions of subsections (a) and (b) of this section, in the case of an institutionalized person who has applied for or is receiving such medical assistance, no conservator shall apply and no court shall approve the application of (1) the net income of the ward to the support of the ward's spouse in an amount that exceeds the monthly income allowed a community spouse as determined by the Department of Social Services pursuant to 42 USC 1396r-5(d)(2)-(4) or (2) any portion of the property of the ward to the support, maintenance and medical treatment of the ward's spouse in an amount that exceeds the amount determined allowable by the department pursuant to 42 USC 1396r-5(f)(1) and (2), notwithstanding the provisions of 42 USC 1396r-5(f)(2)(A)(iv), unless (A) such limitations on income or property would result in significant financial duress or (B) an amount exceeding such limitations is necessary to generate income.

"(e) Upon application of a conservator of the estate, after hearing with notice to the Commissioner of Administrative Services and to all parties who may have an interest as determined by the court, the court may authorize the conservator to pay and distribute gifts of income and principal from the estate of the ward in such amounts or in such form as the court approves,

with the net settlement proceeds. The Probate Court concluded that federal legislation permits the creation of the trust for the benefit of a medicaid recipient without disqualifying him from eligibility to continue to receive services under Title XIX and that such trust is not prohibited by Connecticut law.

Thereafter, pursuant to General Statutes § 45a-186,[7] claiming that the Probate Court improperly had authorized the trust, the department appealed to the trial court to vacate and set aside the Probate Court decree permitting Saunders to establish an irrevocable inter vivos

to individuals and qualified charities as defined in the Internal Revenue Code of 1986, or any corresponding internal revenue code of the United States, as from time to time amended. Such gifts shall be authorized only if the court finds that: (1) In the case of individuals not related to the ward by blood or marriage, the ward has made a previous gift to that individual prior to being declared incapable; (2) in the case of a charity, the ward had made a previous gift to such charity or pledged a gift in writing to such charity prior to being declared incapable; (3) the estate of the ward is more than sufficient to carry out the duties of the conservator as set forth in subsections (a) and (b) of this section, both for the present and foreseeable future, including due provision for the continuing proper care, comfort and maintenance of such ward in accordance with such ward's established standard of living and for the support of persons the ward is legally obligated to support; (4) the purpose of the gifts is not to diminish the estate of the ward so as to qualify the ward for federal or state aid or benefits; and (5) in the case of a ward capable of making an informed decision, the ward has no objection to such gift. The court shall give consideration to the following: (A) The medical condition of the ward, including the prospect of restoration to capacity; (B) the size of the ward's estate; (C) the provisions which, in the judgment of the court, such ward would have made if he or she had been capable, for minimization of income and estate taxes consistent with proper estate planning. The provisions of this section shall not be construed to validate or invalidate any gifts made by a conservator of the estate prior to October 1, 1983."

[7] General Statutes § 45a-186 (formerly § 45-288) provides: "Appeals from probate. (a) Any person aggrieved by any order, denial or decree of a court of probate in any matter, unless otherwise specially provided by law, may appeal therefrom to the Superior Court in accordance with subsection (b) of this section. Except in the case of an appeal by the state, such person shall give security for costs in the amount of one hundred fifty dollars, which may be paid to the clerk, or a recognizance with surety annexed to the appeal and taken before the clerk or a commissioner of the Superior

trust funded with the net proceeds recovered in settlement of the negligence action filed on Jamie's behalf. Saunders moved for summary judgment, claiming that there were no material facts in dispute and that she was entitled to judgment as a matter of law. Making the same assertions, the department filed a cross motion for summary judgment. The trial court concluded that the Probate Court was not empowered to authorize or approve the creation of the trust. Specifically, the trial court held that the Probate Court was without statutory authority to enter the decree permitting Saunders to establish the irrevocable inter vivos trust and, further, that it could not authorize the trust pursuant to its equitable powers because the equitable powers of a probate court can be exercised only *when necessary* to carry out prescribed statutory duties. Finally, following a motion for articulation as to whether the doctrine of substituted judgment is recognized in Connecticut and whether Saunders' creation of the trust fell within that doctrine, the trial court concluded that the doctrine was not an independent ground upon which the Probate Court could have authorized the creation of the trust because the doctrine had been codified in § 45a-655 (e), which the trial court had already concluded was inapplicable. Accordingly, the trial court granted the department's motion for summary judgment.

Saunders appealed from the judgment of the trial court to the Appellate Court and, pursuant to Practice

Court or a bond substantially in accordance with the bond provided for appeals to the Supreme Court. Appeals from any decision rendered in any case after a record is made under sections 51-72 and 51-73 shall be on the record and shall not be a trial de novo.

"(b) Any such appeal shall be filed in the superior court for the judicial district in which such court of probate is located except that (1) any appeal under subsection (b) of section 12-359 or subsection (b) of section 12-367 shall be filed in the judicial district of Hartford and (2) any appeal in a matter concerning removal of a parent as guardian, termination of parental rights or adoption shall be filed in the superior court for juvenile matters having jurisdiction over matters arising in such probate district."

Book § 65-1, formerly § 4023, and General Statutes § 51-199 (c), this court transferred the appeal to itself. We reverse the judgment of the trial court.

In furtherance of her argument that the trial court improperly held that the Probate Court was not authorized to permit the establishment of the trust in question, Saunders advances three claims. First, she claims that the trial court improperly concluded that the broad power statutorily granted to her, as conservatrix, and to the Probate Court to "manage" a ward's estate, under § 45a-655 (a), did not include the power of the Probate Court to authorize establishment of the trust. Second, Saunders asserts that the trial court improperly concluded that the authorization of the establishment of the trust was not within the Probate Court's equitable or implied powers. Finally, Saunders claims that the trial court improperly concluded that she and the Probate Court were not empowered to establish the trust under the doctrine of substituted judgment. We agree with Saunders' first claim, which is dispositive of this appeal, and, therefore, we need not consider her remaining claims.

Before addressing the parties' arguments, we set forth the applicable standard of review of a trial court's ruling on motions for summary judgment. "Summary judgment 'shall be rendered forthwith if the pleadings, affidavits and other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Home Ins. Co.* v. *Aetna Life & Casualty Co.*, 235 Conn. 185, 202, 663 A.2d 1001 (1995), quoting Practice Book § 384, now § 17-49. "The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. . . . When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the

facts that appear in the record." (Internal quotation marks omitted.) *SLI International Corp.* v. *Crystal*, 236 Conn. 156, 163, 671 A.2d 813 (1996). The trial court was presented with cross motions for summary judgment based on undisputed facts. Therefore, our review is plenary and we must determine whether the court's conclusions are "legally and logically correct" and are supported by the record. Id.

Saunders first claims that at the time of the establishment of the trust, the authority to permit the creation of such a trust was conferred upon the Probate Court by § 45a-655 (a), which defines, inter alia, the duties of conservators, and provides in part that "[t]he conservator *shall manage* all the estate and apply so much of the net income thereof, and, if necessary, any part of the principal of the property, which is required to support the ward . . . ." (Emphasis added.) Saunders argues that, because the Probate Court, through a conservatrix, also has the duty to manage an estate, the Probate Court possessed the authority to authorize her creation of the trust. The department contends that the authority to manage Jamie's estate did not include the authority to divest the estate of its assets by transferring them to an inter vivos trustee. Although a recent amendment to § 45a-655 expressly authorizes probate courts to create the specific type of trust at issue in this appeal; see Public Acts 1998, No. 98-232, § 2; the relevant inquiry is whether, at the time of the establishment of the trust in April, 1994, the Probate Court was vested with such authority.

When interpreting a statute, we are guided by well established tenets of statutory construction. "[O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was

designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . Furthermore, [w]e presume that laws are enacted in view of existing relevant statutes . . . and that [s]tatutes are to be interpreted with regard to other relevant statutes because the legislature is presumed to have created a consistent body of law." (Citations omitted; internal quotation marks omitted.) *Conway* v. *Wilton,* 238 Conn. 653, 663–64, 680 A.2d 242 (1996).

We examine first the words of the statute itself. Section 45a-655 (a) provides in part that "[t]he conservator *shall manage* all the estate and apply so much of the net income thereof, and, if necessary, any part of the principal of the property, which is required to support the ward . . . ." (Emphasis added.) The word "manage" is not defined in the General Statutes relating to conservatorships. Moreover, the legislative history provides no guidance as to the meaning to be ascribed to the word "manage." We have declared that " '[i]f a statute or regulation does not sufficiently define a term, it is appropriate to look to the common understanding of the term as expressed in a dictionary.' " *State* v. *Payne,* 240 Conn. 766, 771, 695 A.2d 525 (1997), quoting *State* v. *Indrisano,* 228 Conn. 795, 809, 640 A.2d 986 (1994); see also General Statutes § 1-1 (a). Black's Law Dictionary (6th Ed. 1990) defines "manage" as follows: "To control and direct, to administer, to take charge of. To conduct; to carry on the concerns of a business or establishment. Generally applied to affairs that are somewhat complicated and that involve skill and judgment." Although it would be infeasible to enumerate statutorily every permissible action a conservator might take in the management of a ward's estate, application of the above definition to the word "manage" in § 45a-655 (a) results in a statutory grant of wide-scale authority to the conservator that is, we believe, broad enough

to encompass the creation of the trust at issue in this appeal.

We consider next the legislative history of § 45a-655. Although at the time of the creation of the trust there was nothing in that history to assist us in defining the parameters of a conservator's authority and power to manage a ward's estate, legislative activity regarding the creation of inter vivos trusts that took place subsequent to the circumstances giving rise to this appeal, is instructive on the issue before us. First, we consider No. 98-232 of the 1998 Public Acts (P.A. 98-232), which amended General Statutes §§ 45a-151[8] and 45a-655,[9]

---

[8] General Statutes § 45a-151, as amended by P.A. 98-232, § 1, provides: "(a) Upon application by executors, guardians, conservators, administrators and trustees appointed, or whose appointment has been approved, by the Court of Probate, the court may, after *such notice as the court shall direct* and hearing, authorize such fiduciaries to compromise and settle any doubtful or disputed claims or actions, or any appeal from probate in favor of or against the estates or persons represented by them.

"(b) In order to accomplish such compromise or settlement, the *court may, after deduction of attorney's fees and costs, authorize such settlement as proposed by the fiduciary in a lump sum or in periodic payments to the estate, to an existing trust or to a newly created trust for the benefit of those represented by the fiduciary. Such trusts may include those created in compliance with section 1917(d)(4) of the Social Security Act, 42 USC 1396p(d)(4), as from time to time amended. In the case of a gift or transfer in trust, any transfer to a court-approved trust created by a fiduciary shall be subject to continuing probate court jurisdiction as if it were a testamentary trust. In deciding whether the net settlement as proposed by the fiduciary is beneficial, the court shall consider the best interests of those represented by the fiduciary, and in the case of a decedent's estate, the intention of the decedent. The* court may *also* authorize the conveyance, with or without requiring a bond, of the whole or any part of, or any easement or other interest in, any real property situated in this state forming part of the trust estate or owned by any such trustee, executor or administrator or owned by any deceased person, ward or incapable person for whom such an executor, guardian, conservator or administrator was appointed." The italicized portions of the text were added by the amendment. Other language has been deleted.

[9] General Statutes § 45a-655 (e), as amended by P.A. 98-232, § 2, provides: "(e) Upon application of a conservator of the estate, after hearing with notice to the Commissioner of Administrative Services, *the Commissioner of Social Services* and to all parties who may have an interest as determined

effective October 1, 1998, to authorize probate courts to permit the creation of trusts. Although the passage of the amendment demonstrates clearly the legislature's

by the court, the court may authorize the conservator *to make gifts or other transfers of income and principal from the estate of the ward in such amounts and in such form, outright or in trust, whether to an existing trust or a court-approved trust created by the conservator, as the court orders to or for the benefit of individuals, including the ward, and to or for the benefit of charities, trusts or other institutions described in sections 2055(a) and 2522(a) of* the Internal Revenue Code of 1986, or any corresponding internal revenue code of the United States, as from time to time amended. Such gifts *or transfers* shall be authorized only if the court finds that: (1) In the case of individuals not related to the ward by blood or marriage, the ward *had* made a previous gift to that individual prior to being declared incapable; (2) in the case of a charity, *either (A)* the ward had made a previous gift to such charity, *had* pledged a gift in writing to such charity, *or had otherwise demonstrated support for such charity* prior to being declared incapable; *or (B) the court determines that the gift to the charity is in the best interests of the ward, is consistent with proper estate planning, and there is no reasonable objection by a party having an interest in the ward's estate as determined by the court;* (3) the estate of the ward *and any proposed trust of which the ward is a beneficiary* is more than sufficient to carry out the duties of the conservator as set forth in subsections (a) and (b) of this section, both for the present and foreseeable future, including due provision for the continuing proper care, comfort and maintenance of such ward in accordance with such ward's established standard of living and for the support of persons the ward is legally obligated to support; (4) the purpose of the gifts is not to *diminish the estate of the ward* so as to qualify the ward for federal or state aid or benefits; and (5) in the case of a ward capable of making an informed decision, the ward has no objection to such gift. The court shall give consideration to the following: (A) The medical condition of the ward, including the prospect of restoration to capacity; (B) the size of the ward's estate; (C) the provisions which, in the judgment of the court, such ward would have made if he or she had been capable, for minimization of income and estate taxes consistent with proper estate planning; *and (D) in the case of a trust, whether the trust should be revocable or irrevocable, existing or created by the conservator and court approved. The court should also consider the provisions of an existing estate plan, if any. In the case of a gift or transfer in trust, any transfer to a court-approved trust created by the conservator shall be subject to continuing probate court jurisdiction in the same manner as a testamentary trust including periodic rendering of accounts pursuant to section 45a-177. Notwithstanding any other provision of this section, the court may authorize the creation and funding of a trust that complies with section 1917(d)(4) of the Social Security Act, 42 USC 1396p(d)(4), as from time to time amended.* The provisions of this *subsection* shall not

intent that probate courts be vested with the authority to permit the creation of trusts, the question remains whether the legislature had such an intent when it enacted § 45a-655.

Both parties rely on the 1998 amendment to § 45a-655 (amendment) to support their respective positions. The department claims that by amending the statute, the legislature demonstrated its intent to change existing law. Therefore, according to the department, prior to the passage of the amendment, probate courts did not possess the authority to authorize the establishment of trusts. In contrast, Saunders argues that the legislature was merely restoring to the probate courts a power they possessed until they were stripped of it by the trial court in the present case. Based upon express statements contained in the legislative history of the amendment, we agree with Saunders.

We have recognized a "presumption that, in enacting a statute, the legislature intended to effect a change in existing law." *Shelton* v. *Commissioner of Environmental Protection*, 193 Conn. 506, 513, 479 A.2d 208 (1984). Moreover, it should not be presumed that "the legislature has enacted futile or meaningless legislation or that a change in a law was made without a reason." *City Council* v. *Hall*, 180 Conn. 243, 251, 429 A.2d 481 (1980). The presumption that the enactment of a statute demonstrates a legislative intent to change existing law, however, "may be rebutted by contrary evidence of the legislative intent in the particular case." *Shelton* v. *Commissioner of Environmental Protection*, supra, 513–14. The present discussion involves an amendment, rather than the enactment, of a statute. Although we have stated that subsequent amendments are *generally*

---

be construed to validate or invalidate any gifts made by a conservator of the estate prior to October 1, *1998*." The italicized portions of the text were added by the amendment. Other language has been deleted.

irrelevant when determining legislative intent at the time of the enactment of the underlying bill; *State* v. *McVeigh*, 224 Conn. 593, 619–21, 620 A.2d 133 (1993); we have noted that "[a]n amendment which in effect construes and clarifies a prior statute must be accepted as the legislative declaration of the meaning of the original act." (Internal quotation marks omitted.) *Shelton* v. *Commissioner of Environmental Protection*, supra, 514. Therefore, whether the legislature intended to change or merely clarify existing law is critical to our decision on this issue.

"In order to determine whether an act should be characterized as clarifying legislation [with attendant retroactive effect], we look to the legislative history to determine the legislative intent." *State* v. *Magnano*, 204 Conn. 259, 278, 528 A.2d 760 (1987). The legislative history of the amendment supports the conclusion that the amendment was meant to clarify rather than to change the original meaning of § 45a-655. One factor we have deemed to be significant in determining the clarifying character of legislation is that the legislation was enacted in direct response to a judicial decision that the legislature deemed incorrect. See, e.g., *State* v. *Blasko*, 202 Conn. 541, 557–58, 522 A.2d 753 (1987).

On the floor of the House of Representatives, Representative Michael P. Lawlor, in explaining the purpose of the amendment, stated: "This bill is intended to once again *restore* to the probate court, jurisdiction that traditionally our courts have always had until a recent decision of our State [Superior] Court.[10] In cases involving claims in tort where a beneficiary has a claim against

---

[10] Representative Lawlor actually spoke of a "recent decision of our State *Supreme* Court" that took away the probate courts' jurisdiction over trusts created on behalf of incompetent people. (Emphasis added.) 41 H.R. Proc., Pt. 13, 1998 Sess., p. 4406. The legislative history makes clear, however, that Representative Lawlor was actually referring to an opinion from the Superior Court rather than from the Supreme Court. Speaking before the judiciary committee, Deborah Tedford, an attorney, stated that "[i]n December of

another person, the probate court always exercises jurisdiction over the trusts which were created on behalf of a person who may be incompetent. The court case which was relatively recent took that jurisdiction away from the probate court. This bill *restores* it . . . ." (Emphasis added.) 41 H.R. Proc., Pt. 13, 1998 Sess., p. 4406. Furthermore, Deborah Tedford, an attorney testifying in favor of the bill before the House of Representatives judiciary committee, stated: "We're also concerned that trusts for other legitimate purposes such as estate planning are also being circumscribed by this court ruling. It is for that reason that *we want this statute to clarify what we believe is a statement of existing law that Connecticut probate courts do have the authority and jurisdiction to establish trusts in appropriate situations.*" (Emphasis added.) Conn. Joint Standing Committee Hearings, Judiciary, Pt. 4, 1998 Sess., p. 1065.[11] The foregoing demonstrates clearly that the proponents of the bill believed that, prior to the trial court's decision in this case, probate courts

1997 a Superior Court judge taking the most narrow possible interpretation of probate court power ruled that our courts do not have [the power to establish trusts] although other judges at other times have taken a contrary position. . . . This is particularly awkward as a number of probate courts over the years have, in fact, authorized the establishment of trusts on behalf of many who came before their courts." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 4, 1998 Sess., p. 1064. We note that, although no opinion of this court fits the descriptions of Representative Lawlor and Tedford, the trial court opinion in this case, dated December 16, 1997, does.

[11] We recognize that comments made about proposed legislation during committee hearings are not officially part of the legislative history of that legislation. We have stated, however: "It is now well settled that testimony before legislative committees may be considered in determining the particular problem or issue that the legislature sought to address by the legislation. . . . This is because legislation is a purposive act . . . and, therefore, identifying the particular problem that the legislature sought to resolve helps to identify the purpose or purposes for which the legislature used the language in question." (Internal quotation marks omitted.) *Dowling* v. *Slotnik*, 244 Conn. 781, 804, 712 A.2d 396 (1998). Moreover, we note that Tedford's comments are consistent with Representative Lawlor's subsequent statements made on the floor of the House of Representatives.

were vested with the authority to permit the creation of trusts. Once the trial court divested probate courts of this authority, however, the legislature sought to restore it.

Finally, we note that the final sentence of the amendment provides that "[t]he provisions of this subsection shall not be construed to validate or invalidate any gifts made by a conservator or the estate prior to October 1, 1998."[12] P.A. 98-232, § 2. The department argues that this language demonstrates the legislature's intent that the amendment not apply retroactively.[13]

Initially, we reiterate "[t]he general rule . . . that when a legislative act is intended to clarify existing law it necessarily has retroactive effect." (Internal quotation marks omitted.) *Green* v. *General Dynamics Corp.*, 245 Conn. 66, 78, 712 A.2d 938 (1998). Furthermore, although the language of the amendment states that the provisions of subsection (e) of § 45a-655 shall not be construed to validate gifts made prior to October 1, 1998, we note that we do not rely on the new provisions

---

[12] Prior to the amendment, the final sentence of § 45a-655 (e) provided: "The provisions of this section shall not be construed to validate or invalidate any gifts made by a conservator of the estate prior to October 1, *1983*." (Emphasis added.)

[13] Additionally, the department notes that an amendment (House "B") that would have made the act apply retroactively to October 1, 1993, was rejected by the House. 41 H.R. Proc., supra, p. 4423. Representative Richard D. Tulisano's comments in opposition to this amendment suggest that he opposed the amendment solely because he believed that an express legislative statement of retroactivity was unnecessary. Arguing that probate courts were already vested with the authority to approve the establishment of trusts, he stated: "I rise to oppose the amendment, but to alleviate any fears that may exist, the General Assembly in 1983 allowed the probate court jurisdiction over making gifts, etc. . . . [I]t's necessary to make sure, I think, the current statute stays as it is that they, in fact, had jurisdiction over such inter vivos trusts between 1983 and 1993 when the federal law was passed." Id., p. 4415. Additionally, speaking *in favor* of the proposed amendment, "House B," Representative Lawlor emphasized "that this bill restores to the probate courts jurisdiction they had just a little over a year ago and had for many, many years prior to that." Id., p. 4414.

themselves to support our conclusion that the Probate Court possessed the authority, in 1994, to permit the creation of the trust. Rather, we rely on the legislative history of the amendment, which clearly demonstrates that the courts already possessed such authority. The distinction, though subtle, is crucial.

Additionally, we note that the final sentence of the amendment refers to *gifts* made by a conservator. In addition to providing for gifts, however, the amendment provides for the transfer of assets into trusts, including the kind at issue in this appeal, that is, one created for the sole benefit of the ward. A transfer of assets into such a trust is not a gift. Because the amendment recognizes the distinction between gifts and such transfers, and the limitation contained in the final sentence relates only to gifts, it is clear that the restriction does not pertain to a transfer of assets into a trust made for the ward's own benefit and is inapplicable under the facts of this case.

We next consider a bill that was raised but not enacted into law. Raised House Bill No. 6673, § 5 (January Session 1995) (H.B. 6673), if passed, would have amended § 45a-655 to provide a new subsection (f), which would have provided in pertinent part: "The probate court, in carrying out its obligation to preserve and protect the assets of the ward, may, through the conservator of the estate, after notice and hearing, establish, create or fund one or more trusts to be administered under the supervision of the probate court for the purpose of better management of the assets of the ward if the court determines that the creation of such trust is in the best interest of the ward. . . ." This bill was raised in January, 1995, approximately nine months after the trust at issue in this case was proposed. The department implies that the failure of the bill to be enacted supports its argument that probate courts did not have the authority to permit the creation of inter

vivos trusts prior to October 1, 1998. By contrast, Saunders argues that such a contention is pure conjecture and is not reliable evidence. We agree with Saunders.

House Bill 6673 was never subjected to a vote on the floor of the legislature. As Saunders notes, there is no definitive record as to the reasons for this. As we noted in *State* v. *Miranda,* 245 Conn. 209, 230–31 n.24, 715 A.2d 680 (1998): "[R]eliance on legislative silence is misplaced. It is a basic tenet of statutory construction that we rely on the intent of the legislature as that intent has been *expressed. Connecticut Light & Power Co.* v. *Walsh,* 134 Conn. 295, 301, 57 A.2d 128 (1948) . . . . Ordinarily, we are reluctant to draw inferences regarding legislative intent from the failure of a legislative committee to report a bill to the floor, because in most cases the reasons for that lack of action remain unexpressed and thus obscured in the mist of committee inactivity. *In re Valerie D.*, 223 Conn. 492, 518 n.19, 613 A.2d 748 (1992)." (Citation omitted; emphasis in original; internal quotation marks omitted.) Accordingly, the failure of the bill to pass does not necessarily support the department's argument, especially when an equally plausible alternative argument exists. Saunders asserts that the legislature may have determined that probate courts already possessed such authority and, therefore, no amendment to the statute was necessary until the trial court divested the courts of such authority. This assertion finds strong support in the comments of Representative Lawlor, as quoted previously, and Representative Richard D. Tulisano. See footnote 13 of this opinion. Echoing our words in *Miranda,* we note that the existence of more than one plausible explanation for the failure of H.B. 6673 "best illustrates that one guess is as good as the other, and is the epitome of why we cannot engage in this kind of speculation." *State* v. *Miranda,* supra, 230–31 n.24.

In summary, the legislative history leaves little doubt that the legislature believed that, at the time of the creation of the trust, probate courts possessed the authority to authorize the establishment of such trusts. Although the failure of H.B. 6673 to be enacted into law is not reliable evidence of the legislature's intent pertaining to this issue, the legislative history of the amendment provides sufficient evidence to support Saunders' interpretation of § 45a-655. We conclude, therefore, that at the time of the trust's creation, the Probate Court was vested with the authority to approve Saunders' establishment of the trust.

Our conclusion is fully supported by this court's precedent regarding conservators. In *Marcus' Appeal from Probate*, 199 Conn. 524, 528, 509 A.2d 1 (1986), we discussed the role of conservators as follows: "A conservator has only such powers as are expressly or impliedly given to him by statute. . . . A conservator of the estate, under our law, is a person appointed by the court of probate under the provisions of [General Statutes c. 779, now c. 802h] to supervise the financial affairs of a person found to be incapable of managing his or her own affairs . . . . General Statutes § 45-70a (a) [now § 45a-644 (a)]." (Citations omitted; internal quotation marks omitted.) "A conservator of an estate owes a duty of loyalty to a ward." *Marshall* v. *Kleinman*, 186 Conn. 63, 65, 438 A.2d 1196 (1982). As discussed previously, we believe that the authority to create a trust is within the broad authority to manage a ward's estate conferred upon conservators by § 45a-655 (a). It may be fairly stated that the power is "impliedly given to [a conservator] by statute." (Internal quotation marks omitted.) *Marcus' Appeal from Probate*, supra, 528; *Stempel* v. *Middletown Trust Co.*, 127 Conn. 206, 221, 222, 15 A.2d 305 (1940).

In *Marcus' Appeal from Probate*, supra, 199 Conn. 528–29, we also discussed the relationship between conservators and probate courts, noting that, "[i]n exercising [its statutory] powers, [a conservator] is under the supervision and control of the Probate Court. *Elmendorf* v. *Poprocki*, 155 Conn. 115, 118, 230 A.2d 1 (1967). . . . The probate court is a court of limited jurisdiction and has only such powers as are given it by statute or are reasonably to be implied in order to carry out its statutory powers. *Prince* v. *Sheffield*, 158 Conn. 286, 293–94, 259 A.2d 621 (1969); *Palmer* v. *Reeves*, 120 Conn. 405, 408, 182 A. 138 (1935). . . . The Probate Court is under an affirmative duty to protect the assets of an incompetent's estate. *Marshall* v. *Kleinman*, [supra, 186 Conn. 69]." (Citations omitted; internal quotation marks omitted.) Finally, we stated that "[t]he court, and *not the conservator*, is primarily entrusted with the care and management of the ward's estate, and, in many respects, the conservator is but the agent of the court." (Emphasis in original; internal quotation marks omitted.) *Marcus' Appeal from Probate*, supra, 529.

"[I]t is clear that the conservator acts under the supervision and control of the Probate Court in the care and management of the ward's estate." Id. Under our law, the Probate Court in the present case was under a duty to protect Jamie's assets, and Saunders, the conservatrix, as an arm of the Probate Court, was under the same obligation. By establishing the medicaid-exempt supplemental needs trust in conformance with 42 U.S.C. § 1396p (d) (4) (A) with the assets recovered in a third party tort claim, Saunders, and the Probate Court, through Saunders, were managing and protecting Jamie's finances in his best interests, consistent with their duties as defined by statute and in our case law. If the trust had not been established, the settlement from the tort action would be available to Jamie, who

would then be ineligible for medicaid assistance. Saunders would be forced to exhaust the settlement to meet Jamie's medical needs before reapplying for medicaid assistance. Without medicaid providing the ward's basic medical needs, the tort settlement would be depleted much more quickly than if it were used merely to supplement medicaid assistance. Once he became eligible again for medicaid, Jamie would receive medicaid assistance but would have no assets remaining with which to provide for his supplemental needs. By contrast, with the creation of the trust, Jamie will retain his medicaid eligibility and Saunders can provide for his supplemental needs from the trust assets, while medicaid provides for his basic medical care. Therefore, not only is the latter course of action clearly the better one for Jamie, it may be fairly stated that by failing to follow it, the Probate Court and Saunders potentially could have been deemed to be in dereliction of their duties to Jamie.

The department argues that the authority to manage Jamie's estate does not include the authority to divest the estate by transferring its assets to an inter vivos trustee. Specifically, the department claims that the duty to manage the estate imposes upon Saunders, as conservatrix, a duty to "marshall [Jamie's] assets, to assume possession and assume control of [his] property." According to the department, the duty does not confer upon Saunders the authority to "eliminate [Jamie's] estate in its entirety and transfer it to a trustee." The department contends that the duty of management does not imply the authority to create the trust in question. For the reasons discussed earlier in this opinion, we disagree. Moreover, the department's concern that Jamie retain title to the assets that were used to fund the trust elevates form over substance. Although transferring a ward's assets into a trust does indeed

divest the ward of legal title to the assets,[14] the ward remains the sole person who can benefit from the trust.[15] Jamie is, therefore, the equitable owner of the assets. As noted above, creation of the trust permits Jamie to benefit from the tort settlement for a much longer period of time than he would if the trust were not allowed. Legal title to the assets would be a meaningless possession if purchased at the cost of years worth of additional supplemental needs. We therefore see no reason to hold that legal title to Jamie's assets must remain with him when his best interests clearly militate in favor of the creation of the trust.

The department also claims that the proposed transfer of Jamie's assets to the trust would constitute an improper delegation of the Probate Court's responsibility, acting through the conservator, to manage his estate. Specifically, the department argues that the Probate Court's authority to review actions of a trustee of an inter vivos trust is not comparable to its plenary authority to manage a ward's estate. The department states that the trustee's use of trust funds for Jamie's benefit is defined in the trust agreement, not in state law, and the authority of the reviewing probate court is essentially limited to determining whether the trustee has acted consistently with the terms of the trust. We note, however, that creation of the trust requires probate court approval. See General Statutes § 45a-655 (e); P.A. 98-232, § 2. Therefore, the court may exert considerable influence over the terms of the trust, thus ensuring that the trust would be managed to the court's satisfaction. Moreover, the Probate Court will have jurisdiction over Saunders' accounts in her capacity

[14] Article 2 of the trust instrument provides that the trust shall be funded by Jamie's "[grant of] the net proceeds of the [tort] claim to the Co-Trustees . . . ."

[15] Pursuant to article 4 of the trust instrument, expenditures from the trust can be used only on Jamie's behalf during his lifetime.

as conservatrix, under § 45a-655 (c).[16] The statutorily granted power to demand periodic accounting of a conservatrix further demonstrates the court's continuing supervision of Saunders and her use of the trust assets. Finally, under General Statutes § 45a-175 (c) (1),[17]

[16] See footnote 6 of this opinion.

[17] General Statutes § 45a-175 (formerly § 45-267) provides: "Jurisdiction of accounts of fiduciaries. Appointment of auditor to examine accounts, when. (a) Courts of probate shall have jurisdiction of the interim and final accounts of testamentary trustees, trustees appointed by the courts of probate, conservators, guardians, persons appointed by probate courts to sell the land of minors, executors, administrators and trustees in insolvency, and, to the extent provided for in this section, shall have jurisdiction of accounts of the actions of trustees of inter vivos trusts and attorneys-in-fact acting under powers of attorney.

"(b) A trustee or settlor of an inter vivos trust or an attorney-in-fact or the successor of the trustee, settlor or attorney-in-fact or the grantor of such power of attorney or his legal representative may make application to the court of probate for the district where the trustee or the attorney-in-fact has his or its principal place of business or to the court of probate for the district where the trustee or any one of them or the settlor or the attorney-in-fact or the grantor of the power resides or, in the case of a deceased settlor or grantor, to the court of probate having jurisdiction over the estate of the settlor or grantor for submission to the jurisdiction of the court of an account for allowance of the trustee's or attorney's actions under such trust or power.

"(c) (1) Any beneficiary of an inter vivos trust may petition a court of probate having jurisdiction under this section for an accounting by the trustee or trustees. The court may, after hearing with notice to all interested parties, grant the petition and require an accounting for such periods of time as it determines are reasonable and necessary on finding that: (A) The beneficiary has an interest in the trust sufficient to entitle him to an accounting, (B) cause has been shown that an accounting is necessary, and (C) the petition is not for the purpose of harassment.

"(2) A court of probate shall have jurisdiction to require an accounting under subdivision (1) of subsection (c) of this section if (A) a trustee of the trust resides in its district, (B) in the case of a corporate trustee, the trustee has its principal place of business in the district, (C) any of the trust assets are maintained or evidences of intangible property of the trust are situated in the district, or (D) the settlor resides in the district.

"(3) As used in subdivision (1) of subsection (c) of this section, 'beneficiary' means any person currently receiving payments of income or principal from the trust, or who may be entitled to receive income or principal or both from the trust at some future date, or the legal representative of such person.

which provides that "[a]ny beneficiary of an inter vivos trust may petition a court of probate having jurisdiction under [§ 45a-175] for an accounting by the trustee," the department, as remainderman of the trust, will have standing to petition for an accounting should it question the trustee's use of the trust assets. Therefore, although the form of ownership of Jamie's estate will change, Saunders' responsibilities will remain the same and the Probate Court will continue to have jurisdiction over her as both conservatrix and trustee. Accordingly, the creation of the trust is not an impermissible delegation of a conservator's duty over a ward's estate.

Finally, the department relies on two statutory provisions to support its contention that, in 1994, probate courts lacked the authority to permit the establishment of trusts. First, the department cites § 45a-655 (d), which provides in pertinent part: "In the case of any person receiving public or medical assistance . . . the

"(d) The action to submit an accounting to the court, whether by an inter vivos trustee or attorney acting under a power of attorney or whether pursuant to petition of another party, shall not subject the trust or the power of attorney to the continuing jurisdiction of the probate court.

"(e) If the court finds such appointment to be necessary and in the best interests of the estate, the court upon its own motion may appoint an auditor to be selected from a list provided by the Probate Court Administrator, to examine accounts over which the court has jurisdiction under this section, except those accounts on matters in which the fiduciary or cofiduciary is a corporation having trust powers. The Probate Court Administrator shall promulgate regulations in accordance with section 45a-77 concerning the compilation of a list of qualified auditors. Costs of the audit may be charged to the fiduciary, any party in interest and the estate, in such proportion as the court shall direct if the court finds such charge to be equitable. Any such share may be paid from the fund established under section 45a-82, subject to the approval of the Probate Court Administrator, if it is determined that the person obligated to pay such share is unable to pay or to charge such amount to the estate would cause undue hardship.

"(f) Upon the allowance of any such account, the court shall determine the rights of the fiduciaries or the attorney-in-fact rendering the account and of the parties interested in the account, subject to appeal as in other cases. The court shall cause notice of the hearing on the account to be given in such manner and to such parties as it directs."

conservator of the estate shall apply toward the cost of care of such person any assets exceeding limits on assets set by statute or regulations adopted by the Commissioner of Social Services. . . ." Essentially, the department claims that this provision requires Saunders as conservatrix to apply all assets toward the cost of Jamie's medical care rather than allowing her to place the assets in trust for Jamie's supplemental needs. Second, the department cites § 17b-85, which provides in relevant part that no person supported in whole or in part by state financial assistance "shall sell, assign, transfer, encumber or otherwise dispose of any property without the consent of the commissioner [of social services]. . . ." The department argues that the transfer of Jamie's assets into an irrevocable trust, which transfers title to Saunders as conservatrix without the department's approval, is a statutorily impermissible transfer.[18] In response, Saunders claims that the supremacy clause of the United States constitution and the doctrine of federal preemption bar the invocation of these two statutory provisions to block the transfer of the settlement proceeds into the trust in question. Although we arrive at the same result as Saunders, we reach that destination by a different route.

As we have previously noted, the legislature recently amended § 45a-655 to restore to the probate courts the authority to approve the creation of trusts. Because "[w]e presume that laws are enacted in view of existing

---

[18] We do not believe that the legislature intended § 17b-85 to be read as the department suggests, that is, to require, in all circumstances, the approval of the commissioner of social services of any sale, assignment, transfer or encumbrance of the assets of a person receiving state financial assistance. Such an interpretation essentially would allow the commissioner of social services to veto arbitrarily any transaction it chooses to veto. With regard to the present case, this reading of the statute would render virtually meaningless the authority to manage a ward's estate expressly granted to the Probate Court in § 45a-655 (a). We do not believe that the legislature intended to create such an inconsistency.

relevant statutes . . . and that [s]tatutes are to be interpreted with regard to other relevant statutes because the legislature is presumed to have created a consistent body of law"; (citations omitted; internal quotation marks omitted) *Conway* v. *Wilton*, supra, 238 Conn. 664; we presume that the legislature passed the amendment with full knowledge of the existence and intended applications of §§ 45a-655 (d) and 17b-85. Clearly, the legislature does not believe that these provisions could be employed to bar the creation of trusts.[19] Rather, the passage of the amendment demonstrates the legislature's intent that §§ 45a-655 (d) and 17b-85 coexist with the amendment.

We also noted previously herein that the legislative history makes clear that probate courts were already vested with the authority to approve the creation of trusts until the trial court stripped them of that authority. Therefore, what is permissible today was permissible when the trust was created in 1994. Consequently, because §§ 45a-655 (d) and 17b-85 will not bar the establishment of a trust today, likewise, they could not do so when the trust was proposed in 1994. Because we conclude that the legislature did not intend for these provisions to be used as the department proposes, we need not address Saunders' supremacy clause or preemption arguments.

---

[19] Although we conclude that these provisions are not intended to bar the creation of trusts such as the one at issue in this appeal, we presume that they do serve legislative ends. For example, we have held that § 17-82j, now § 17b-85, precludes a conservator from disclaiming his ward's right to receive any portion of her interest as remainderman in a testamentary trust. *Dept. of Income Maintenance* v. *Watts*, 211 Conn. 323, 330, 558 A.2d 998 (1989); see also *State* v. *Murtha*, 179 Conn. 463, 467, 427 A.2d 807 (1980). Although § 45a-655 (d) has yet to be interpreted by an appellate court in this state, we presume that it likewise furthers a legislative purpose. We need not decide today, however, the precise applications of these statutes. It is enough that we conclude, on the basis of the aforementioned reasons, that they do *not* serve to bar the creation of trusts as the department suggests.

In summary, we hold that the Probate Court possessed the statutory authority, pursuant to § 45a-655 (a), to authorize Saunders, as an agent of the Probate Court, to establish the trust in question. Having so concluded, and having deemed inapplicable the statutes that the department asserts operated, in 1994, as a bar to the trust's creation, we next briefly turn our attention to the department's opposition to Saunders' motion for summary judgment. We note that the department asserted no other basis upon which to deny Saunders' motion. Additionally, as evidenced by the parties' filing of cross motions for summary judgment, we note that there are no material facts in dispute. Therefore, we conclude that judgment should be rendered in favor of Saunders.

The judgment is reversed and the case is remanded to the trial court with direction to render judgment for Saunders.

In this opinion the other justices concurred.