[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Before the court is the plaintiffs February 4, 2000 appeal from the defendant Wilton Planning and Zoning Commission's (PZ) denial of three applications filed by the plaintiff, AvalonBay Communities, Inc. (Avalon). Avalon brings its appeal pursuant to General Statutes §8-30g, the Affordable Housing Land Use Appeals Act.[1]
 I PROCEDURAL HISTORY
Avalon commenced this appeal on January 27, 2000, by service of process (citation and appeal) upon Wilton's town clerk and on the chairperson for PZ. On February 4, 2000, Avalon filed its appeal, with a February 29, 2000 return date, in the Superior Court, Judicial District of Stamford-Norwalk at Stamford. On March 7, 2000, Avalon moved to transfer its appeal to the Superior Court, Judicial District of New Britain, tax and administrative appeals session. On March 8, 2000, the motion was granted by the court, Mintz, J. PZ filed its answer and return of record on July 5, 2000. PZ filed its brief on September 6, 2000 and Avalon filed its brief on November 1, 2000. PZ filed a reply brief on December 8, 2000. The court heard argument on the appeal on May 11, 2001. A site visit was conducted on July 17, 2001.
 II
CT Page 12523 FACTS
Avalon is a Maryland corporation with a place of business in Wilton, Connecticut. Avalon has a contract to purchase the subject property, 10.6 acres, known as 116 Danbury Road, Wilton, Connecticut. It is owned by James and Marilyn O'Halloran. The subject property is zoned R-1A (principal use is single family detached dwelling on lots of at least one acre). The subject property is bordered on the north by an eighteen unit multifamily residential development known as Wilton Hills, on the west by Route 7, and to the west of Route 7, by a variety of commercial and industrial uses.
In May, 1999, Avalon submitted its applications to PZ. Avalon's first application was to amend the Wilton zoning regulations by adding a § 29.5.E to the regulations establishing and regulating a housing opportunity development district (HODD). Avalon's second application was to rezone the subject property from the current R-LA zone to the proposed HODD zone. Avalon's third application is for site plan approval for a 119 unit development with 25% of the units set aside for affordable housing.
On May 26, 1999, Avalon filed its applications to amend the text of the zoning regulations, to rezone all 10.6 acres of the subject property from R-LA to HODD and for site plan approval for a 119 rental development on the subject property, with twenty-five percent of the units set aside for moderate income households. PZ noticed and held public hearings on Avalon's applications on July 26, 1999, continued to September 13, 1999. At the July 26, 1999 public hearing, approximately fifteen members of the public spoke against Avalon's applications; at the September 13, 1999 public hearing, approximately thirteen members of the public spoke against the applications, one person who spoke was neutral and one person spoke for the applications. In support of the applications, the following persons spoke: Mark Forlenza, Senior Development Director for Avalon; John Scott of Scott Kenney Partners in Westport regarding housing market conditions in Wilton; Dave Schiff of Saccardi and Schiff regarding land use planning considerations; John Milone and Tom Sheil of Milone and McBroom regarding engineering, infrastructure and site planning; Timothy Pelton of Holdsworth Associates regarding emergency safety and access; and Alan Mess with Barkin and Mess Associates regarding traffic.
Wilton's planning and zoning officials offered comments on the applications, as did Michael Anderson from Fuss O'Neill as engineering consultants for the town; John P. Thompson, an engineer who looked at the traffic and safety aspects of the proposals; David Portman from Frederick P. Clark Associates, Inc. who spoke about the parking and site layout for the town; a letter from the town's fire marshal; a letter from the CT Page 12524 Norwalk planning commission, who was asked to look at the proposals because the proposed development would tie into the Norwalk sewer system; and a report from the conservation commission.
PZ rendered its decision to deny the applications on November 8, 1999 and these decisions were published in the Wilton Bulletin on November 11, 1999. PZ set forth its findings and the reasons for its decision to deny each one of Avalon's applications.
On November 24, 1999, pursuant to General Statutes (Rev. to 1999) § 8-30g (d), Avalon modified its applications and resubmitted them to PZ for review. The changes Avalon made in its resubmissions were to reduce the number of housing units from 119 to 113; to eliminate all regulated activities in the wetlands and watercourses; to convert to townhouse-type construction, thereby reducing site coverage to thirty-five percent; amended the HODD regulations to conform to existing regulations; to submit geotechnical engineering and soils analysis; and to reduce the entrance driveway from 1,100 feet to 440 feet.
PZ noticed and held a public hearing on Avalon's resubmitted applications on December 8, 1999. At this hearing, members of the public spoke against the modified applications. Speaking in support of the modified applications on behalf of Avalon and in response to comments made by Wilton's consultants were Tom Sheil and John Milone from Milone and McBroom; Mark Forlenza of AvalonBay; Alan Mess with Barkin and Mess Associates; Ravindra Malviya, a geotechnical engineer from Barakos Landino who addressed slope disturbance and retaining walls; and Dave Schiff from Saccardi and Schiff. PZ rendered its decision to deny the resubmitted applications on January 5, 2000 and these decisions were published in the Wilton Bulletin on January 13, 2000. PZ set forth its findings and decision to deny each one of the resubmitted applications.
 III JURISDICTION AGGRIEVEMENT
Under General Statutes (Rev. to 1999) § 8-30g (b), "[a]ny person whose affordable housing application is denied . . . may appeal such decision pursuant to the procedures of this section." Thus, "under [General Statutes (Rev. to 1999)] § 8-30g (b), only an affordable housing applicant may initiate an appeal from a decision of a commission . . ." Ensign-Bickford Realty Corp. v. Zoning Commission, 245 Conn. 257,267, 715 A.2d 701 (1998). CT Page 12525
General Statutes (Rev. to 1999) § 8-30g (b) further provides that "[e]xcept as otherwise provided in this section, appeals involving an affordable housing application shall proceed in conformance with the provisions of said sections 8-8, 8-9, 8-28, 8-30, or 8-30a, as applicable." Thus, although § 8-30g does not directly state that proof of aggrievement is required, the reference to §§ 8-8, 8-9, 8-28, 8-30
and 8-30a satisfies the court that proof of aggrievement is required. TNAssociates v. Town of New Milford Planning Zoning Commission, Superior Court, judicial district of New Britain, Docket No. 492236 (November 10, 1999, Holzberg, J.); AvalonBay Communities, Inc. v. Orange Planning Zoning Commission, Superior Court, judicial district of New Britain, Docket No. 492239 (August 13, 1999, Munro, J.); Vineyard ConstructionManagement Corp. v. Town of Trumbull, Superior Court, judicial district of New Britain, Docket No. 492251 (July 23, 1999, Koletsky, J.); D'Amatov. Orange Planning Zoning Commission, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 516355 (December 13, 1993, Mottolese, J.) (10 Conn. L. Rptr. 444, 446).
"Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected. . . . We traditionally have applied the following two part test to determine whether aggrievement exists: (1) does the allegedly aggrieved party have a specific, personal and legal interest in the subject matter of a decision; and (2) has this interest been specially and injuriously affected by the decision." (Citations omitted; internal quotation marks omitted.) Gladysz v. Planning ZoningCommission, 256 Conn. 249, 255-56, ___ A.2d ___ (2001). The plaintiff has the burden of pleading and proving aggrievement. McNally v. ZoningCommission, 225 Conn. 1, 6, 621 A.2d 279 (1993). In the present case, Avalon alleges aggrievement, claiming that it is a contract purchaser of the subject property and that it is the proposed developer of housing with an affordable housing component. At the hearing on Avalon's appeal on May 11, 2001, the parties stipulated that Avalon has a contract with the O'Hallorans to purchase the subject property and that the O'Hallorans have owned the subject property continuously and without interruption from May 26, 1999, the date of Avalon's initial application to PZ, to the date of the stipulation. Avalon's representative testified that Avalon entered into a one year contract with the O'Hallorans to purchase the subject property after a due diligence period in 1999, extended the contract for twelve months after the initial one year and extended the contract to purchase again in February, 2001.[2]
"A contract purchaser of the property that is the subject of the application meets [the] two-part test [set forth in Gladysz v. Planning Zoning Commission, supra, 256 Conn. 255-56] and has standing to appeal a decision on the application. See Shapero v. Zoning Board, 192 Conn. 367, CT Page 12526 376-77, 472 A.2d 345 (1984); RR Pool Home, Inc. v. Zoning Board ofAppeals, 43 Conn. App. 563, 569-70, 684 A.2d 1207 (1996)." AvalonBayCommunities, Inc. v. Orange Planning Zoning Commission, supra, Superior Court, Docket No. 492239. Thus, Avalon has pleaded and proved aggrievement by demonstrating that it is the contract purchaser of the property that is the subject of the affordable housing application. Accordingly, the court finds that during all times pertinent to these proceedings, Avalon has a valid contract to purchase the property from the owners, James and Marilyn O'Halloran, and is, therefore, aggrieved.
TIMELINESS AND SERVICE OF PROCESS
Avalon served process on Joan Maude Ventres, Wilton's town clerk, and on Thomas C. Gallagher, the chairperson of PZ on January 27, 2000, which is less than fifteen days after notice of PZ's denial of Avalon's resubmitted applications was published in the Wilton Bulletin on January 13, 2000.[3] This appeal, therefore, is timely and the proper parties were served, pursuant to General Statutes (Rev. to 1999) §§ 8-8 (b), (e), 8-30g (b).
For appeals brought pursuant to General Statutes § 8-8, and, hence, § 8-30g, the citation is analogous to the writ used to commence a civil action and directs a proper officer to summon the agency whose decision is being appealed. See Tolly v. Department of HumanResources, 225 Conn. 13, 18-19, 621 A.2d 719 (1993); Sheehan v. ZoningCommission, 173 Conn. 408, 413, 378 A.2d 519 (1977) (citation is direction to officer to summon agency whose decision is being appealed). The file contains a proper citation.
 IV SCOPE/STANDARD OF JUDICIAL REVIEW
In its brief, PZ argues that its burden of proof and the court's standard of review in an appeal brought under the statute is set forth in General Statutes (Rev. to 1999) § 8-30g (c)(1) (A-D).[4] PZ further argues that its decision on Avalon's applications and reasons cited to support the decisions satisfy the four-part test established in General Statutes (Rev. to 1999) § 8-30g (c). Avalon, on the other hand, argues that the affordable housing appeals statute was revised by the legislature, Public Acts 2000, No. 00-206, that the revision has a retroactive effect and, thus, PZ ignored the public act, thereby misstating and misapplying the statute to the record in its brief.[5]
PZ argues that a planning and zoning commission acts in its legislative capacity when adopting new regulations or rezoning property, CT Page 12527 as was requested in the present case by Avalon in two of its three applications. See Kaufman v. Zoning Commission, 232 Conn. 122, 153,653 A.2d 798 (1995) (where court found that "when the commission rejected the proposed amendment to its zoning map, the commission was acting in its legislative capacity"); DJ Quarry Products, Inc. v. Planning Zoning Commission, 217 Conn. 447, 450, 585 A.2d 1227 (1991) (upholding the trial court's acknowledgment that the commission, acting in a legislative capacity, had broad authority to adopt the amendments to the zoning regulations). The Supreme Court further concluded that the appeals procedure under General Statutes § 8-30g applies to a commission's "legislative decision to grant or deny a zone change." West HartfordInterfaith Coalition, Inc. v. Town Council, 228 Conn. 498, 508,636 A.2d 1342 (1994).[6] Thus, § 8-30g applies to PZ's denial of each one of Avalon's applications.
Avalon's argument regarding the recent enactment of P.A. 00-206[7]
raises a two-fold issue: whether the legislative change to General Statutes § 8-30g changes the traditional standard of review for the trial court of an affordable housing appeal and, if it changes the standard, whether the change should be applied retroactively in the present appeal.[8] This issue was recently addressed by our Supreme Court in Quarry Knoll II Corp. v. Planning Zoning Commission,256 Conn. 674, ___ A.2d ___ (2001), where the court found that the legislature, in enacting P.A. 00-206, now codified as the current version of General Statutes § 8-30g, changed subsection (c) (now subsection (g)) to break "the review standards of the act into two separate sentences. The purpose is to clarify the difference between the sufficiency of the evidence standard in the first sentence and the weighing test in the second sentence, a matter which seems to have caused some concern as the result of a recent Supreme Court decision.[9]
. . . Thus, in an affordable housing application the court first determines whether the Commission has met its burden of proof that the decision is supported by sufficient evidence in the record. Having done this, thecourt not the Commission, then weighs whether the Communization has met its burden of proof, that the decision is necessary to protect substantial public interests which clearly outweigh the need for affordable housing and which cannot be protected by reasonable changes to the affordable housing development." (Emphasis added.) 43 H.R.Proc., Pt. 14, 2000 Sess., p. 4644, remarks of Representative Patrick J. Flaherty.
Thus, the court's review on appeal is plenary, not de novo.[10] SeeQuarry Knoll II Corp. v. Planning Zoning Commission, supra, 256 Conn. 727
("Under subparagraphs (B), (C) and (D) of [General Statutes (Rev. to 1999) § 8-30g (c)], however, the court must review the commission's decision independently, based upon its own scrupulous examination of the CT Page 12528 record. Therefore, the proper scope of review regarding whether the commission has sustained its burden of proof. requires the court, not to ascertain whether the commission's decision is supported by sufficient evidence, but to conduct a plenary review of the record in order to make an independent determination on this issue"). Furthermore, P.A. 00-206, codified as the current version of § 8-30g, imposes an affirmative duty on the trial court to make an independent determination "whether the commission has sustained its burden of proof, namely that: its decision is based upon the protection of some substantial public interest; the public interest clearly outweighs the need for affordable housing; and there are no modifications that reasonably can be made to the application that would permit the application to be granted." Quarry Knoll II Corp.v. Planning Zoning Commission, supra, 256 Conn. 727.
Avalon further argues that, because the legislature meant to clarify the standard of review in the statute, it should be applied by the court retroactively. "Whether to apply [P.A. 00-206] retroactively or prospectively depends upon the intent of the legislature in enacting the statute. . . . In order to determine the legislative intent, we utilize well established rules of statutory construction. . . . Where an amendment is intended to clarify the original intent of an earlier statute, it necessarily has retroactive effect. . . . We generally look to the statutory language and the pertinent legislative history to ascertain whether the legislature intended that the amendment be given retrospective effect." (Internal quotation marks omitted.) Oxford TireSupply, Inc. v. Commissioner of Revenue Services, 253 Conn. 683, 691-92,755 A.2d 850 (2000).
Furthermore, "[i]n order to determine whether an act should be characterized as clarifying legislation [with attendant retroactive effect], we look to the legislative history to determine the legislative intent. . . . One factor we have deemed to be significant in determining the clarifying character of legislation is that the legislation was enacted in direct response to a judicial decision that the legislature deemed incorrect. (Citation omitted; internal quotation marks omitted.)Department of Social Services v. Saunders, 247 Conn. 686, 702,724 A.2d 1093 (1999); see also Quarry Knoll II Corp. v. Planning ZoningCommission, supra, 256 Conn. 722. Indeed, as the above legislative history in the present case shows, the change made to General Statutes (Rev. to 1999) § 8-30g (c) was meant to "clarify the difference between the sufficiency of the evidence standard in the first sentence and the weighing test in the second sentence, a matter which seems to have caused some concern as the result of a recent Supreme Court decision." 43 H.R.Proc., Pt. 14, 2000 Sess., p. 4644, remarks of Representative Patrick J. Flaherty. CT Page 12529
Accordingly, "[t]he pertinent legislative history . . . contains compelling evidence that the amendment [to General Statutes (Rev. to 1999) § 8-30g (c)] was intended to clarify, rather than to change, the original meaning of § 8-30g (c)." Quarry Knoll II Corp. y, Planning Zoning Commission, supra, 256 Conn. 723.[11] "The legislature's prompt and unambiguous response to this court's decision inChristian Activities Council provides persuasive support for [the] contention that the legislature intended to clarify, rather than to change, the scope of our judicial review of a commission's decision to deny an affordable housing land use application. Indeed, the foregoing analysis demonstrates clearly that the proponents of this amendment believed that, prior to our decision in Christian Activities Council, our scope of review had involved a two step process. Once those steps were blurred in Christian Activities Council, however, the legislature sought to restore the process." Id., 726.[12]
The Supreme Court concluded that "Public Act 00-206 appears to be a classic reaction to a judicial interpretation that was deemed inappropriate. . . . Once litigation brought that ambiguity to light, the legislature acted to remove any doubt about its earlier intentions. . . . The legislature has the power to make evident to us that it had always intended a more stringent scope of review in an affordable housing land use appeal. Therefore, we conclude that the legislature intendedP.A. 00-206, § 1(g), to be retroactive." (Brackets omitted; citation omitted; internal quotation marks omitted.) Id., 727-28.
The change made by the legislature to General Statutes § 8-30g
(c), now codified as § 8-30g (g), was to clarify the court's standard of review of an affordable housing appeal brought pursuant to the statute, not to change the commission's burden in its decision making about an affordable housing application, and the change to § 8-30g
(1)(g) is retroactive.
 V DISCUSSION
The commission stated reasons for its denial of Avalon's original and modified applications for amending Wilton's zoning regulations, to rezone the subject property and for site plan approval. The court must evaluate each reason individually, since any one valid reason is sufficient to justify the commission's action. Primerica v. Planning ZoningCommission, supra, 211 Conn. 96. However, because some of PZ's reasons for denying Avalon's applications overlap, those reasons that are closely related will be analyzed together by the court. CT Page 12530
 No Relationship to Existing Zoning Regulations; Underlying Amendment to Zoning Map Not Adopted (Resolutions #100-1REG; #100-1MAP: Reasons 1 and 2; Resolution #100-1MAP: Reason 7)
PZ denied Avalon's application to amend the zoning regulations, in part, because the proposed regulations do not bear any relationship to the existing zoning regulations and are not in conformance with the comprehensive plan. According to PZ's reasons for its denial, "the size of a structure, its setback requirements, separating distances, etc. are designed to be compatible within the zone itself and to the adjoining zones and character of the community. The applicant appears to have arbitrarily chosen one requirement from one zone and a second from another and has added requirements that do not meet the standards of Wilton's Zoning Regulations. The applicant has acknowledged, and has failed to provide any justification for, differences in its proposed regulations with those of Wilton's in areas that are vital to the protection of public health and safety including limitation of disturbance of slopes which affect site stability, amount of regrading and the provision of sufficient number of parking spaces."
In its brief, PZ argues that it adopted a plan of conservation and development, pursuant to General Statutes § 8-23 and that this plan provides for a maximum density often units per acre and that this density is limited to Wilton center to "encourage the development of a diversity of housing types, including affordable housing, in locations accessible to shopping and services within a concentrated mixed-use core."
This reason for denying Avalon's applications is best characterized as a concern about intensification of land use or density. Such a concern about density fails to represent a compelling government interest to form a valid basis for PZ's denial of Avalon's application to change the zone or rezone the subject property. The town plan cannot serve as a basis for denial of an affordable housing application. Our Supreme Court has held that "a town plan is merely advisory. . . . The purpose of the plan is to set forth the most desirable use of land and an overall plan for the town. . . . Because the overall objectives contained in the town plan must be implemented by the enactment of specific regulations, the plan itself can operate only as an interpretive tool." (Citations omitted.)Smith v. Zoning Board of Appeals, 227 Conn. 71, 87-8 8, 629 A.2d 1089, cert. denied, 510 U.S. 1164, 114 S.Ct. 1190, 127 L.Ed.2d 540 (1993).
If PZ were allowed to deny any affordable housing application because the application exceeded the density called for by any other zone in the town, then it could "undermine [the] very important objective [of affordable housing]. Under [PZ's] proposed interpretation, a town could CT Page 12531 utilize zoning to impede a developer from appealing under the statute."West Hartford Interfaith Coalition v. Town Council, supra, 228 Conn. 511.
PZ further reasons that it cannot adopt a change of zone that is created by amendments to Wilton's zoning regulations that have not been adopted by PZ. This is not a valid reason for denying Avalon's affordable housing applications. Denial of an affordable housing application because it fails to comply with a town's zoning regulations subverts the intent of General Statutes § 8-30g. See Wisniowski v.Planning Commission, 37 Conn. App. 303, 317, 655 A.2d 1146, cert. denied233 Conn. 909, 658 A.2d 981 (1995)[13].
PZ cannot simply deny an application to amend its zoning regulations then deny an application to rezone the property to the amended zoning regulations, reasoning that the proposed rezone fails to comply with current zoning regulations. "Our conclusion is that the plain and unambiguous language of § 8-30g does not contemplate a denial of an affordable housing subdivision application on the ground that it does not comply with the underlying zoning of an area." Wisniowski v. PlanningCommission, supra, 37 Conn. App. 312.
 Comparison With Other High Density Developments; Transitional Nature of the Area Surrounding the Property (Resolution #100-1MAP: Reasons 3 and 6)
PZ notes Avalon's comparison of its proposed change to the zoning of the subject property to a sixty-five bed assisted living facility located on Route 7 (Danbury Road). Denying Avalon's modified applications based on comparison with other high density developments is based on PZ's finding that the comparison made by Avalon is misplaced and misleading "due to the vast difference in traffic generation, number of people living at the site (65 versus 300), disturbance of the site and environmental impacts. Such density as proposed by [Avalon] is more appropriate in Wilton Center due to pedestrian access, location of retail stores, recreational facilities and public transit."
In the Wilton zoning regulations, the purpose of the regulations governing multifamily residential districts is to "provide appropriate locations for a range of densities, and increase the availability of affordable housing in Wilton, where adequate facilities and services are present." The regulations further require that "[a]ll residential developments shall be served by public sewer, public water supply; and fire protection systems to the specifications of the Fire Marshal."
There are two concerns with PZ's denial of Avalon's modified proposal CT Page 12532 to rezone its property to HODD on the basis that the density proposed by the project is more appropriately located in Wilton Center. Wilton's current zoning regulations do not preclude developments with the density proposed by Avalon. In fact, for multifamily, residential developments, all the regulations require is access to public sewers, public water and fire protection systems that comply with specifications set forth by the town's fire marshal. PZ does not base its denial of Avalon's modified proposal to rezone the subject property because the proposed zone fails to have access to public sewers, public water and fire protection.
Secondly, denying an affordable housing application because it is not located near the center of a town is not and, given the intent of the legislature, cannot be a valid basis for denying the application. SeeWest Hartford Interfaith Coalition v. Town Council, supra, 228 Conn. 510-11 (citing the legislative history of General Statutes (Rev. to 1993) §8-30g where Representative William Cibes stated, in response to question about whether a zoning commission could deny a proposal to develop multifamily housing in a single family zone, that the "municipality might have very good grounds for not having multifamily dwellings in a particular area. The soil type, the capacity of the infrastructure, various reasons such as that might have been a reason for the municipality not to adopt a particular zone for that particular area, but per se, there would not be — it would not [be] a reason for rejecting the application.").
While access to the services provided by a town's center area is a logical goal for locating affordable housing in an area accessible to those services, PZ failed to provide any evidence that this goal is necessary to protect the public health and safety. Furthermore, such a goal cannot clearly outweigh the need for affordable housing and would thwart the intent of the legislature in adopting General Statutes §8-30g. This reason for denying Avalon's modified proposal to rezone the subject property to HODD is not valid.
In terms of the surrounding property, Avalon presented testimony by a consultant who reviewed the site plan in conjunction with the surrounding properties who said that Avalon's proposed use of the subject property would create a transitional use compatible with surrounding properties. PZ noted that "[s]uch an analysis ignores the reality of a low-density residential use of one acre zoning to the east and south of the property, and three units to the acre to the north of the property." Again, this reason for denying Avalon's modified proposal to rezone the subject property implicates PZ's concern with the density of the proposed development.
At the September 13, 1999 hearing on Avalon's applications, David CT Page 12533 Schiff from Saccardi and Schiff, planning and development consultants, who spoke on behalf of Avalon's applications, noted that the town plan identified the subject property as appropriate for higher density development and pointed out that there were a number of zones contiguous to the subject property that altered the character of the area from low density, single family development to a mixed use of commercial and higher density multifamily development.
Many of the residents who spoke at the hearing expressed their concerns about the density of the proposed development and its incompatibility with the surrounding neighborhood. David Portman also reviewed the application for the town and surmised that the proposed development, at 11 units per acre, failed to provide a transition from the properties zoned commercial and the surrounding properties that are zoned DRD (three units per acre), single family cluster housing, and single family housing on the other two sides of the subject property.
As was stated earlier, a concern about density fails to represent a compelling government interest to form a valid basis for PZ's denial of Avalon's application to change the zone or rezone the subject property. Furthermore, in considering an affordable housing application, while PZ is justified in considering the affects of a proposal on surrounding property, if the proposal fails to raise substantial health and safety issues, PZ is not justified in denying the affordable housing application because it does not "fit in" with the surrounding properties. See TCR New Canaan, Inc. v. Planning Zoning Commission, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 389353 (April 5, 1992, Berger, J.) (where court noted that "[z]oning is not to be based upon a plebiscite of the neighbors. Their wishes are to be considered but the final ruling is to be governed by the basic consideration of the benefit or harm involved to the community at large. . . .")
 Preservation of Trees; Inland Wetlands Commission Report (Resolution #100-1Z: Reasons 1 and 12)
In its denial of both the original and the modified site plan for the subject property, PZ expresses its concern with Avalon's "preservation of existing features of the site which are of value for the development or to the Town as a whole." PZ's consultant found that, in Avalon's modified site plan, "the vast majority of the trees to be saved are within the wetlands regulated area or are on the boundaries of the property where they would be protected under wetland regulations or zoning setback and landscaping requirements." Furthermore, PZ expressed its concern with the damage to the root systems of trees located in the center of the subject property caused by Avalon's development. CT Page 12534 Furthermore, even though Avalon proposed to move a `tot lot' from the courtyard area in its original proposal as a response to PZ's prior stated concerns about recreational facilities on the site plan, PZ found that the location to which Avalon proposed to move the `tot lot' would have an impact on trees that Avalon was proposing to save in its modified site plan. Finally, although Avalon proposed a tree protection plan in its modified site plan, PZ found this proposal ineffective because PZ intended Avalon to accomplish the objective of preserving the trees and no assurances were made that a protection plan is feasible without substantial redesign of the site improvements.
There is no evidence in the record, nor does PZ attempt to suggest there is such evidence, that these concerns raise a substantial interest in public health, safety and related matters. Avalon modified its site plan to include a tree protection plan, which PZ dismissed based on an unsubstantiated fear that the tree protection plan was not feasible. Such an unsubstantiated fear, however, cannot "rise to the level of sufficient evidence to sustain [PZ's] burden of proof. . . ." Rinaldi v. SuffieldZoning Planning Commission, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 533603 (October 26, 1995,Leheny, J.). It is difficult to balance the need for affordable housing against an unsubstantiated concern about something that has not occurred and, with the proper assurances and requirements, may never occur. Thus, this reason for denying Avalon's site plan is invalid.
In denying Avalon's modified site plan, PZ further states that it "considered the report of the Inland Wetlands Commission dated January 5, 2000 concerning inadequate information submitted at its public hearing concerning failure to address concerns regarding habitat impacts for wetlands species and elements of the proposed stormwater management system." PZ fails to address how or why this reason constitutes a public health and safety issue that outweighs the need for affordable housing.[14]
The commission is bound by statute, however, to consider the inland wetlands commission's report in reviewing Avalon's modified site plan. General Statutes § 8-3 (g).[15] "The zoning commission must give the wetlands commission report due consideration. We do not read this as a statutory mandate that the zoning commission's decision be based on the wetlands report. To afford due consideration is to give such weight or significance to a particular factor as under the circumstances it seems to merit and this involves discretion." (Internal quotation marks omitted.) Arway v. Bloom, 29 Conn. App. 469, 479-80, 615 A.2d 1075
(1992), appeal dismissed, 227 Conn. 799, 633 A.2d 281 (1993). "[W]etlands are not protected solely through the simultaneous review provisions of General Statutes § 8-3 (g). The Inland Wetlands and Watercourses CT Page 12535 Act, at General Statutes § 22a-42a (c), independently protects wetlands by requiring that no regulated activity shall be conducted upon any wetland and watercourse without a permit." (Internal quotation marks omitted.) Read v. Planning Zoning Commission, 35 Conn. App. 317, 325,646 A.2d 222 (1994).
In the present case, the commission had the report of the inland wetlands commission in which the inland wetlands commission denied Avalon's permit application because of the proposed development's impact on habitat for wetlands species and elements of the proposed stormwater management system. The commission, therefore, was aware that Avalon failed to obtain a permit to conduct a regulated activity upon any wetland or watercourse and could base its denial of Avalon's applications on that basis.
 Inadequate Parking Requirement; Parking for Bus Drop Off (Resolution #100-1REG: Reasons 3 and 5; Resolution #100-1Z: Reasons 6 and 14); Parking in CLP Easement (Resolution #100-1Z: Reason 7)
In its original denial, PZ expressed concern about the parking requirements in Avalon's proposed regulation, which proposed two spaces per unit, but no visitor parking. In its modification, Avalon decreased the number of parking spaces per unit. PZ denied Avalon's proposed amendment to the zoning regulations on the basis that inadequate parking creates health and safety concerns as access will be blocked and internal circulation will be hazardous.
Wilton's current zoning regulations require two parking spaces per dwelling unit plus one visitor space per two dwelling units for one, two and three bedroom multifamily dwelling units. At the December 8, 1999 hearing, Alan Mess, with Barkin and Mess Associates, addressed the modification to Avalon's original application, stating that the site plan accompanying Avalon's proposed amendment to Wilton's zoning regulations would result in ninety-two garages and 123 open lot spaces for a total of 215 spaces, or a parking ratio of 1.9. Mr. Mess mentioned that the site plan included fifty-six tandem spaces (spaces in front of garages), which could be used by residents and visitors and, although they are not considered under either the current zoning regulations or Avalon's proposed regulations, if these spaces were counted the parking ratio would be 2.40. Furthermore, Avalon's representative gave PZ examples of parking ratios at similar developments throughout Connecticut and determined that 1.85 spaces per unit would be adequate.
There is no evidence in the record, let alone sufficient evidence, that CT Page 12536 PZ attempted to counter Avalon's evidence about the adequacy of the parking provisions in the modified proposal to amend the zoning regulations, nor is there evidence to demonstrate how 1.9 spaces per unit, versus the two spaces per dwelling unit under the current zoning regulations, creates a "hazard rising to the level of a substantial public interest." Mutual Housing Association v. Planning ZoningCommission, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 549155 (August 12, 1996, Koletsky, J.). PZ offered no evidence that the parking requirements contained in Avalon's proposed amendment to Wilton's zoning regulations would result in access being blocked and internal circulation being hazardous. "The commission's expressions of opinion d[o] not . . . rise to the level of sufficient evidence to sustain its burden of proof. . . ." Rinaldi v. SuffieldZoning Planning Commission, supra, Superior Court, Docket No. 533603. Accordingly, inadequate parking as a reason for denying Avalon's proposed amendment to Wilton's zoning regulations is not valid.
Avalon's proposed amendment to Wilton's zoning regulations includes parking spaces that will be limited for use as drop off by parents of their children who ride the bus. In denying the modified application, PZ takes issue with Avalon's position that these spaces will be available for unrestricted use at times other than when needed for the bus drop off. The result is then that locating the parking spaces in the front yard setback if the spaces are limited to drop off parking is acceptable to PZ, yet, because Avalon would make the spaces available for unrestricted use other than when needed for drop off, the violation of the front yard setback requirement is not acceptable and renders the proposed amendment to Wilton's zoning regulations ineffective.
In some ways, this reason is closely related to the reason stated for PZ's denial of Avalon's modified proposed amendment to Wilton's zoning regulations because of parking. PZ takes issue with Avalon using the parking set aside for bus drop off in Avalon's calculations of its parking ratio. In denying Avalon's modified proposed amendment to the zoning regulations, PZ fails to note that Avalon offered to add an additional three spaces to the bus drop off area and to post signage at the bus drop off area restricting parking during bus drop off periods in the morning and afternoon.
Members of PZ opined during the hearing on the modified proposal to amend the zoning regulations that, if the area were used for general parking, there was the possibility that someone would park in the area in the morning or afternoon when it was needed for bus pick up and drop off. This stated reason by the commission raises the substantial public interest in the safety of children waiting in the bus drop off area to go to school. While the concern with the parking in the area is somewhat CT Page 12537 speculative, as is more fully discussed above, when this concern is combined with the safety issue of the slope cuts needed for the single access driveway into the development and the traffic concerns to and from Route 7, as is more fully discussed below, the substantial interest in public safety becomes more salient. Therefore, the court finds that, in denying Avalon's application because of the safety related to the bus drop off area and related parking, combined with other issues that impact these identified safety concerns, the commission identified a substantial concern with public safety that outweighs the need for this affordable housing development.
As for Avalon's site plan, in both the original and modified applications, PZ found the proposed parking to be inadequate. In denying Avalon's site plan applications, PZ expressed its concern for the safety hazard created by the inadequate parking for children, residents and visitors. Further, PZ found that the "site plan does not comply with Wilton's Zoning Regulations or the applicant's proposed regulations in that the spaces dedicated to the bus drop-off are counted as unrestricted parking spaces towards the parking requirements," resulting in a further reduction of parking spaces.
PZ notes that, at the public hearing on the modified proposed site plan, Avalon offered three additional parking spaces in the bus drop off area, but that there were conflicting projections of the number of children living at the site, causing concern on the part of PZ for the safety of children potentially needing to use the bus drop off area. Furthermore, PZ notes that, although Avalon offered to post signs at the bus drop off area, the unrestricted use of this area, together with use of the parking spaces to satisfy Wilton's minimal parking requirements, make this an untenable solution to the safety problem.
As discussed above, relative to Avalon's modified proposed amendment to Wilton's zoning regulations and the modified proposal to rezone the subject property, there is insufficient evidence in the record to support parking, alone, as a valid reason for PZ denying Avalon's site plan I application. There are other concerns, however, such as the steepness of the slopes, the single access driveway into the site and traffic in from and onto Route 7, which, combined with the parking, particularly at the bus drop off area, raise a substantial public interest in safety that outweigh the need for this affordable housing project. These concerns are more fully discussed below.
Denying Avalon's proposed site plan because use of the CLP easement located on the subject property is "subject to a condition that `slopes must be stable and not steeper than 3:1 with an access way along the right-of-way, not steeper than 10:1'" is speculative. PZ's engineering CT Page 12538 consultant found, as noted in PZ's original denial of the site plan application, that it does not appear as though Avalon can meet the conditions for use of the easement for parking, thereby exacerbating the parking problems noted above and creating a further safety hazard.
The basis of PZ's concern with parking in the CLP easement for transmission lines on the subject property is a June 7, 1999 letter from CLP to Avalon in which it provides conditions for use of the easement by Avalon for parking. In its resubmission and at the hearing on the modified applications, Avalon contended that its modified site plan complies with these conditions.
In deciding whether to approve Avalon's modified site plan, PZ was faced with conflicting expert testimony regarding whether Avalon's modified site plan complies with CLP's conditions for use of its easement for parking. If PZ were to approve the site plan and Avalon, indeed, violates the conditions for use, of the CLP easement, theoretically, at least, then CLP will not allow Avalon to use the easement. Avalon, in turn, would then be in violation of the parking requirements contained within the zoning regulations and the town would be faced with enforcing the regulations. PZ in erring on the side of caution is recognizing the potential problem should Avalon fail to comply with CLP's requirements for use of the easement. This conjectural concern does not rise to the level of a substantial public interest that outweighs the need for affordable housing. concerns regarding habitat impacts for wetlands species and elements of the proposed stormwater management system."[16]
Although there is some implication of a public interest should Avalon be unable to provide adequate parking in accordance with the zoning regulations, PZ fails to meet its burden of showing, in the record, that "such public interests cannot be protected by reasonable changes to the affordable housing development." General Statutes § 8-30g. Thus, the CLP easement issue fails to provide a valid reason for PZ to deny Avalon's modified site plan application.
 Infrastructure Considerations: Environmental Impact Statement (Resolution #100-1Z: Reason 5); Underground Detention Structures (Resolution #100-1Z: Reason 1.0); Floodplain Detention (Resolution #100-1Z, Reason 11); Disturbance for Steep Slopes (Resolution #100-1REG: Reason 4; Resolution #100-1Z: Reasons 2 and 13); Height of Retaining Walls (Resolution #100-1Z: Reason 3); Density of the Development (Resolution #100-1MAP: Reason 4) CT Page 12539
In denying Avalon's applications for the infrastructure considerations, as well as the traffic considerations, there is sufficient support in the record. Furthermore, there is support in the record for PZ's finding that the public health and safety implications of Avalon's proposals outweigh the need for this affordable housing proposal at this site.
In denying Avalon's applications for lack of an environmental impact statement, PZ questions the November 22, 1999 letter submitted by Saccardi Schiff on behalf of Avalon "purporting to be an environmental impact statement," which states that "since no significant adverse impacts are anticipated, no alternatives are required." PZ expresses its concern that the disturbance to steep slopes, the amount of regrading and material to be moved, and the height of the retaining walls leads PZ to the conclusion that there must be some impact to the environment that has not been addressed by Avalon in either its original or modified applications.
In its modified proposed amendment to Wilton's zoning regulations to include the HODD zone, Avalon includes the requirement for an environmental impact statement, which is required under Wilton's current zoning regulations for special permit applications. The current regulation requires an applicant to state that "[t]he extent to which any sensitive environmental features on the site may be disturbed and what measures shall be taken to mitigate these impacts. Consideration shall be given to steep slopes, (including erosion control), wetlands, drainage ways and vegetation and any other land feature considered to be significant."
Avalon submitted an environmental impact statement with supporting documentation with its November 24, 1999 modified applications. In this report, no impacts requiring mitigation were found by Avalon's expert.
PZ can deny a site plan application "where there is a possibility that approval of the application could result in environmental harm or physical injury to the residents of the development as long as there is a reasonable basis in the record for concluding that its denial was necessary to protect the public interest. The record therefore must contain evidence concerning the potential harm that would result if the [plan was approved] . . . and concerning the probability that such harm in fact would occur." Kaufman v. Zoning Commission, supra, 232 Conn. 156.
There are safety issues regarding the disturbance of the slopes on the site, with water detention and with access and traffic that represent substantial public interests in health, safety and other matters PZ may CT Page 12540 legally consider. The record contains sufficient evidence of issues of public safety that PZ found outweigh the need for this development at this site. Despite PZ identifying these issues, Avalon failed to provide an "adequate" environmental impact statement that addressed the identified issues.
 Underground Detention Structures
PZ states that Avalon "has proposed underground detention structures but has provided no information to accurately evaluate whether these structures would be effective in Spring when there are high ground water levels." In response to this concern, John Milone, Avalon's engineer, stated that they reviewed the ground water levels and the test pits and determined that "there's no reason to believe there would be an increase in the seasonal high ground water." Milone also notes that PZ's expert fails to offer any substantiation for its concern relative to the underground detention structures.
PZ's concern about the detention structures is based on the town's engineering consultant's comment that "[a] subsurface stormwater structure like those proposed by the applicant should be designed above the seasonal high groundwater to ensure that the structure will function as designed throughout the year. The applicant has not set these structures above the seasonal high groundwater, creating a situation where stormwater may not enter the structure and exacerbate downstream flooding." After reviewing Avalon's presentation at the December 8, 1999 hearing on the modified applications, Fuss O'Neill followed up its concerns by stating that it "could not find in the application the basis for his claim that `seasonal high groundwater would not rise 4-5 feet higher than the levels observed by the applicant.'"
Thus, the underground detention structure and the potential for exacerbating downstream flooding raises a substantial public interest in both health and safety. Despite PZ indicating its specific concern in denying Avalon's original application, Avalon failed to address the concern in its modified application. The capacity of the infrastructure of a proposed development is a substantial concern in deciding whether a particular proposal should be adopted. See West Hartford InterfaithCoalition v. Town Council, supra, 228 Conn. 510-11. Avalon's proposals fail to adequately address this concern.
 Floodplain Detention
In the original application, PZ "found that [Avalon] was proposing to fill 3, 200 square feet of the 100-year flood plain for detention basin "E." In the modified design, the town's engineering consultant stated CT Page 12541 that the design would result in fill of approximately 4, 800 square feet for detention basin "C". . . . As a matter of public policy there should be no net decrease in the flood storage capacity because loss of storage (cumulative and per site) could create flooding impacts off site."
John Milone, Avalon's engineer, disagreed with PZ's expert regarding filling of the floodplain at the December 8, 1999 hearing, stating that, in his opinion, there "will not be any loss of flood storage by this application." PZ was faced with conflicting testimony of experts. Avalon made changes to the application to address the concern the town's expert raised about the floodplain detention. The court is left to conclude that there is insufficient evidence in the record to deny Avalon's modified site plan application because of flood storage.
 Maximum Disturbance for Steep Slopes; Retaining Walls; Density of Development
In originally denying Avalon's proposed amendment to Wilton's zoning regulations, PZ expressed its concern that the proposed regulations did not provide for maximum disturbance of steep slopes. In its modification, Avalon provided a requirement that a geotechnical analysis and design of retaining walls be submitted prior to PZ's approval of a site plan. In denying the modification, PZ found that "[d]esign of retaining walls in advance of disturbance gives an indication of the type of disturbance that will be encountered on site, but with no upper limit to the amount of disturbance or regrading of steep slopes, the likelihood of erosion both within and off the property during construction cannot be ignored. The absence of any limits to disturbance, will provide no incentives for protection of natural contours of the land, protection of existing vegetation or limit the impact of cuts and fills on the property."
Currently, Wilton's zoning regulations require that the "maximum height of all retaining walls and slope treatments on slopes steeper than 2:1 in residential districts shall be six feet." At the December 8, 1999 hearing on Avalon's modified proposed amendment to the zoning regulations, Ravi Malviya, a geotechnical engineer, spoke regarding a geotechnical report of an investigation done at the subject property and also spoke about the design analysis of the retaining walls. Tom Sheil with Milone and McBroom told PZ that there was at least one retaining wall on the site which would be ten feet.
The stated purpose in Wilton's zoning regulations for adoption of the regulations pertaining to protection of slopes is to "maintain the overall environmental quality of the Town, preserve scenic quality, minimize disruption to natural drainage patterns, maintain stability of CT Page 12542 environmentally sensitive slopes and minimize the aesthetic impact of alteration of hillsides."
In denying Avalon's proposed site plan, PZ reasons that "[t]he modified site development plan does not avoid disturbing steep slopes on the site, and provides no definitive amount of disturbance to steep slopes thereby creating the potential for erosion both within and off-site." PZ notes that, "[w]hile [Avalon] provided a geotechnical analysis and engineered plan as part of its proposal, such assessment only serves to confirm the Commission's previously-expressed concerns that such a site plan is not consistent with the Commission's responsibility to protect the public interest in the safety of surrounding property and residents." Furthermore, Wilton's current zoning regulations require that the "maximum height of all retaining walls and slope treatments on slopes steeper than 2:1 in residential districts shall be six feet." At the December 8, 1999 hearing on Avalon's modified applications, Avalon presented expert testimony to support a finding that at least one of the retaining walls on the site would exceed Wilton's current regulations.
PZ also reasons that Avalon's proposed site plan should be denied because the proposed retaining walls exceed not only the height allowed by Wilton's current zoning regulations, but exceed the height of such walls in Avalon's proposed amendment to Wilton's zoning regulations, as well. The health and safety issue cited by PZ as a reason for denying Avalon's proposed site plan is that "children will be living in the proposed development" and the "height of such retaining walls even with safety fencing installed at the top of the wall, is likely to pose a major safety hazard on the site."
Finally, PZ states that the "proposed development of the site at a density of 113 luxury town houses ignores the severe slopes on the site and impact of wetlands." PZ goes on to cite the severe off-site impacts of erosion and increase in traffic congestion, which will be detrimental to the health and safety of surrounding property and residents.
PZ's concerns about the density of the proposed amendment to Wilton's zoning regulations and of the proposed development, is not necessarily a valid reason for denying an affordable housing appeal. See, e.g., WestHartford Interfaith Coalition v. Town Council, supra, 228 Conn. 511. "In order to qualify as a legitimate basis for denial of an affordable housing application, density must represent a substantial public interest in health, safety or other matters which the commission may legally consider." (Internal quotation marks omitted.) Thompson v. ZoningCommission, Stratford, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 494184 (January 11, 2000, Mottolese, J.). citing CT Page 12543 General Statutes (Rev. to 1999) § 8-30g (c)(1)(B). The court must determine whether there is sufficient evidence in the record to support PZ's findings about the impact Avalon's proposals would have on the health and safety of the surrounding property and residents of the development and then determine whether these concerns, if supported, outweigh the need for affordable housing and whether reasonable changes can be made to the proposals to address PZ's concerns.
PZ received comments from Fuss O'Neill, Inc., regarding the slopes, grading and retaining walls. The town's expert identified three retaining walls in excess of six feet and recommended that safety measures such as fencing be installed to prevent children from falling off the walls.
At the December 8, 1999 hearing on Avalon's modified applications, Avalon's expert testified that the retaining walls had been evaluated in terms of their stability, but was uncertain as to how many walls would exceed the town's regulation of a maximum height for retaining walls of six feet. No testimony was offered, however, that Avalon would undertake safety measures to address PZ's concern with the impact of the retaining walls on the safety of the development's residents.
Furthermore, the town's expert referenced discrepancies in maximum cut depths into slopes that would be necessary for road construction. After reviewing Avalon's comments regarding these cuts made at the December 8, 1999 hearing, Fuss O'Neill followed up their comments by stating that Avalon failed to address earth movement for road construction, but addressed earth movement for foundations. Thus, Avalon failed to address PZ's concern that the cuts into the slopes were too severe, thereby creating the need for retaining walls that exceed the town's regulations, which were adopted to protect public safety.
PZ's concern with the development causing severe slope disturbance and the impact on public safety is an example of how density can impact a public safety issue; Thompson v. Zoning Commission, Stratford, supra, Superior Court, Docket No. 494184; if Avalon were to grade the slopes to avoid the severity of the slopes currently proposed, the development would have to be reconfigured to contain less units. There is, therefore, sufficient evidence in the record that PZ, in initially rejecting Avalon's applications, suggested reasonable modifications (i.e., safety measures such as fencing), which Avalon failed to address in its amended applications. There is also evidence in the record that supports PZ's finding that no further reasonable modifications could be suggested to protect the identified substantial public interest in safety resulting from the severe slopes short of redesigning the site plan. General Statutes § 8-30g does not impose such a requirement on the municipality. CT Page 12544
Accordingly, the court finds that there is sufficient evidence in the record to support PZ's findings that the proposed site plan involves severe cuts into the slopes on the site, Avalon's proposed amendment to the zoning regulations, if adopted, would be violated by the severity of the cuts and that the cuts into the slopes represent a substantial public interest in safety. It is further found that, in weighing the evidence before PZ, the substantial public interest in safety identified by PZ outweighs the need for this affordable housing proposal on this site and that PZ's proposed reasonable modifications to alleviate the identified safety issues were ignored by Avalon, leaving PZ, as its only alternative, to propose reconfiguration of the site plan, resulting in less severe grading of the slopes and fewer units within the development. General Statutes § 8-30g does not impose such a sweeping requirement on the municipality in reviewing an affordable housing proposal.
 Traffic Issues: Single Access Driveway (Resolution #100-1MAP: Reason 5); Traffic Safety and Single Access Driveway (Resolution #100-1Z: Reasons 8 and 9); Truck Trips (Resolution #100-1Z: Reason 4)
PZ denied Avalon's proposed change of the zone of the subject property to the HODD zone because development of the site, under the proposed amendment to Wilton's zoning regulations, is limited for high-density residential development "due to the continued likelihood that a single access drive will be the only access to the site."
At the September 13, 1999 continuation of the hearing on Avalon's original proposal to rezone the subject property, David Portman of Frederick P. Clark Associates, community planning consultants, spoke to PZ about the potential impacts on safety of a single access driveway with the grade and curvature involved in Avalon's proposal. In its modified proposal to rezone the property, Avalon reduced the size of the single access driveway from 1050 feet to 450 feet and relocated it so that it was no longer directly across Route 7 from the entry to the self-storage facility. There was also discussion at that hearing about how the driveway had been reconfigured to separate left turns and right turns onto Route 7 and how many vehicles could be backed up on the driveway before it started to taper.
Part of PZ's concern with the single access driveway is the grade, because it is steep, and the other part of PZ's concern is the impact of the driveway on traffic safety. While the court could agree with PZ's consultant, David Portman, that a single access driveway into a CT Page 12545 development of the size proposed by Avalon constitutes questionable planning, there is insufficient evidence in the record to support PZ's finding that a single access driveway, as a reason standing alone, implicates substantial health and safety considerations that outweigh the need for affordable housing.[17] As is more fully discussed above, however, the grading into the slope to build the roadway does represent a substantial concern by PZ with public safety, as does PZ's concern with the traffic in relation to a single access to a development of the size proposed by Avalon.
In denying Avalon's proposed site plan, PZ cites its traffic consultant's concern with the ability of the single access driveway to and from the site to handle inbound and outbound traffic off Route 7. PZ also expressed its concern with the safety of the development's inhabitants with a single access, although in its modification, Avalon reduced the length of the driveway from 1, 050 feet to 440 feet. Yet, according to the town's expert, Avalon continued to ignore the impact on public safety surrounding a single site access drive for a development of this size.
PZ's concern with the public safety in terms of both the single access and traffic is based on the density of the project, both in terms of the proposed amendment to the zoning regulations to increase the number of units per acre, and in terms of the site plan containing the 113 units. Traffic control is a legitimate goal of zoning. General Statutes §§ 8-2
and 8-23. "The impact of development on traffic and area roads is a legitimate concern affecting the safety and general welfare of the public." Vineyard Construction Management Corp. v. Town of Trumbull,
supra, Superior Court, Docket No. 492251. "Traffic safety is without a doubt a substantial public interest warranting protection. . . . Moreover, it is not overall traffic that controls, but the density of the traffic." (Citations omitted.) Mackowski v. Stratford Planning ZoningCommission, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 334661 (October 22, 1997, Belinkie, J.T.R.).
For PZ's decision to deny Avalon's applications based on the substantial public interest of traffic safety warranting protection, "the public interest in traffic safety must also outweigh the need for affordable housing under § 8-30g." Vineyard Construction ManagementCorp. v. Town of Trumbull, supra, Superior Court, Docket No. 492251. While it cannot be said that the traffic safety issue clearly outweighs the need for affordable housing it is this affordable housing development that raises the substantial public issue with traffic safety. The court finds that, "on the basis of the evidence in the record, [PZ] reasonably could have concluded that it could not simultaneously grant the zone change and protect the public interest." Kaufman v. Zoning Commission,
CT Page 12546 supra, 232 Conn. 166.
PZ's expert, John Thompson, reviewed Avalon's modified site plan and maintained that the single access driveway would still be a level of service (LOS) F, or a failed condition. Thompson further states that an LOS F is "clearly not desirable." At the December 8, 1999 hearing, Avalon's expert, Alan Mess, testified that there were sufficient gaps at the revised location of the driveway due to traffic signals at Route 7's intersections with Grumman Road and Route 33. Mess also pointed to a development with a drive on Route 7 that had been approved with an LOS F.
As PZ's expert states, a LOS F is clearly undesirable, but can be mitigated by such things as construction of accel/decel lanes on Route 7 at the site driveway, a southbound left turn lane on Route 7, the widening of Route 7 opposite the site drive so that cars on Route 7 can bypass cars waiting to make a left turn into the site or right turn-in and right turn-out restrictions at the site drive and Route 7. Despite these suggested mitigation measures, Avalon failed to make any attempt to mitigate the traffic issues raised by its proposals in its modified applications. Rather, Avalon relied on its expert's testimony that a nearby development also had a LOS F turning out of their development, even though the expert also admitted that the nearby development would generate half of the trips projected to be generated by Avalon's development.
Thus, this appeal is distinguishable from Kaufman v. ZoningCommission, supra, 232 Conn. 162, where "all the evidence in the record showed that the potential traffic problem would be solved by making certain road improvements. The plaintiff, furthermore, agreed to make those improvements. On this record, therefore, the commission's decision to deny the zone change was not `necessary to protect substantial public interests.' General Statutes § 8-30g (c)(2)." (Emphasis added.) Id. Here, the record evidence shows that Avalon's proposals will create the traffic safety issue and Avalon relies on a nearby development with a LOS F driveway to set a precedent for why PZ should ignore the substantial safety problems, even though the nearby development has a lower density and generates less traffic. Avalon makes no attempt to mitigate the traffic issues found by both the town's experts and its own experts. PZ is under no obligation to approve an affordable housing plan that creates a substantial public safety issue. See Kaufman v. Zoning Commission, supra, 232 Conn. 163 ("This holding reflects the policy concern that, in the face of evidence of impending harm to the public interest, zoning commissions should not grant zone changes without assurances, in the record, that preventive steps will be taken to minimize the risk of harm"). CT Page 12547
PZ also denied Avalon's modified site plan application because of the impact of truck trips that are anticipated to "exacerbate traffic congestion on Danbury Road." PZ points out that the "original estimation of the number of truck trips amounted to approximately 2, 000 truck trips to remove material from the site. In its modification the applicant estimates that there will be a ten percent reduction in the amount of material to be trucked off site, but the applicant provides no support for this contention, which appears to be understated. With cuts on the site far greater than that estimated by the applicant, the Commission's original concern with the impact of truck traffic appears to be increased by the modified application."
PZ relies on its expert's opinion that the cuts into the slopes to create the access road to the site will be twenty-four to twenty-eight feet, rather than the fifteen feet, as estimated by Avalon's expert. These cuts, in turn, will result in more earth to be removed from the site via trucks, thereby increasing the number of trips to and from the site with access off Route 7. While the court recognizes that the dangers of truck traffic do not clearly outweigh the need for affordable housing; Old Farms Crossing Associates, LTD v. Planning ZoningCommission, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 547862 (June 6, 1996, Mottolese, J.); such traffic combined with the findings of the experts about the traffic near the site's location does raise a substantial safety issue that outweighs the need for this affordable housing project that creates the substantial safety issue, as more fully discussed above.
Finally, in its appeal brief, PZ maintains that it could not protect the substantial public interests forming the bases for its denial of Avalon's affordable housing applications by reasonable changes to the proposals because one change would affect another change and PZ would be left in the position of rewriting Avalon's proposals. Weighing the sufficient evidence contained in the record, the court finds that the record discloses no attempt on the part of Avalon, in its modified applications, to address PZ's concerns about the single access driveway or related traffic problems articulated in the denial of Avalon's original applications.
The court finds sufficient evidence in the record to support PZ's decision to deny Avalon's applications and the reasons cited for PZ's decision based on its concern with the severe cuts into the slopes for the proposed infrastructure, the single access driveway and traffic safety. Weighing the evidence before PZ at its hearings on Avalon's applications, the court further finds that PZ's decision is necessary to protect the identified substantial public interest in safety, which public CT Page 12548 interest clearly outweighs the need for affordable housing, as proposed by Avalon. Finally, the court finds that PZ suggested changes to the proposals to mitigate the impacts of the development on the safety issues, but Avalon ignored PZ's suggestions, choosing, instead, to make minimal changes to its original proposals. Because PZ's action may be sustained if even one reason is sufficient to support denial of the application; Primerica v. Planning Zoning Commission, supra, 211 Conn. 96; and the court finds that several reasons given by PZ are sufficient to support its decision, Avalon's appeal is denied.
CONCLUSION
In revising the current version of General Statutes § 8-30g, the legislature intended that the court should determine whether the court would have reached the same conclusion as the zoning commission based on the evidence in the record before the zoning commission. Applying this standard of review to PZ's reasons for denying Avalon's applications, the court finds that there is sufficient evidence in the record to support PZ's denials and to support a finding that PZ met its burden under General Statutes § 8-30g. Accordingly, the court denies Avalon's appeal.
 The Court By ___________________, J. Munro