SANTA FUEL, INC. *v.* JOHN J. VARGA ET AL.
(AC 22796)

Foti, Bishop and West, Js.

---

Argued March 18—officially released June 17, 2003

*Richard McCarthy,* for the appellants (defendants).

*Ronald D. Japha*, with whom were *Abraham M. Hoff-man* and, on the brief, *Abraham I. Gordon* and *Richard S. Scalo*, for the appellee (plaintiff).

*Opinion*

WEST, J. In this action to foreclose a mechanic's lien filed by the plaintiff, Santa Fuel, Inc., the defendants[1] appeal from the orders of the trial court denying their motions to discharge the lien.[2] On appeal, the defendants claim that the court, *Brennan, J.*, improperly denied their amended motion to discharge the lien, concluding that (1) the plaintiff had rendered services to a building or any of its appurtenances within the meaning of General Statutes § 49-33, (2) the defendants had failed to sustain the burden of proof necessary to discharge the lien, and (3) the owner or someone rightfully acting on his behalf had agreed to pay for the materials and services provided. The defendants also claim that the court, *Thim, J.*, improperly denied their second amended motion to discharge the lien by concluding that (4) the agreement entered into was exempt from the Home Improvement Act, General Statutes § 20-418 et seq., and (5) the transaction in question was not a home solicitation sale governed by the Home Solicitation Sales Act, General Statutes § 42-134a et seq. We affirm the orders of the trial court.

The following facts, as set forth in the courts' memoranda of decision, are not in dispute. In January, 1999, Joseph W. Farrace, now deceased, was the owner of real property known as 171 Lloyd Drive (premises) in Fairfield, for whom and where the plaintiff had provided

---

[1] The defendants are John J. Varga, owner of the subject premises, and American Home Mortgage, holder of a mortgage deed on the premises. Pursuant to an indemnification agreement, Jacquelyn Skultety, executrix of the estate of Joseph W. Farrace, is defending the action.

[2] General Statutes § 49-35c (a) provides: "Any order entered as provided in subsection (b) of section 49-35b shall be deemed a final judgment for the purpose of appeal."

fuel and maintenance services for a number of years. Farrace had two daughters, Jacquelyn Skultety (executrix) and Mary Peddle. For some time prior to Farrace's death, the executrix conducted her father's affairs pursuant to a power of attorney.

To facilitate the sale of the premises, the executrix requested that the plaintiff remove an underground fuel storage tank on the premises. On January 6, 1999, an agent of the plaintiff signed an agreement for the services requested and presented it to the executrix. The agreement contained an addendum that stated in part: "Removal and disposal of contaminated fill if encountered shall constitute an extra charge. If after the tank has been removed and it is determined that an environmental problem exists, such as contaminated soil, oil or gasoline is in the grave, the cost to remediate the environmental problem will be considered an extra charge." The executrix signed the agreement and the addendum on January 15, 1999.

Employees of the plaintiff commenced their services on January 20, 1999. After the tank had been removed, the soil was found to be contaminated because the tank had leaked. On January 20, 1999, Alexander Skultety, the executrix's husband, signed, "as buyer," a document in which the plaintiff proposed to furnish the labor and materials necessary to remediate the contamination. The executrix knew that her husband had signed the document and that the plaintiff was to perform the remediation services. The plaintiff's employees completed the requested services on February 1, 1999. The plaintiff claims that cost of the labor and materials provided is $17,968.50.

Farrace died, testate, in February, 1999, shortly after the plaintiff completed its services. Farrace's will was admitted to probate on March 2, 1999, and named Jacquelyn Skultety as executrix. Farrace had devised the

premises, among other things, to the executrix and Peddle. On April 8, 1999, the plaintiff caused to be filed with the Fairfield town clerk a certificate of mechanic's lien for the cost of labor and materials that had been provided. On April 13, 1999, Jacquelyn Skultety, in her capacity as executrix of Farrace's estate, was served with a copy of the certificate of mechanic's lien.

On April 22, 1999, the executrix, by way of an executor's deed, conveyed the premises to the defendant John J. Varga. She also signed an indemnification agreement in favor of the defendants, agreeing to defend any action commenced by the plaintiff to foreclose its lien and to pay any judgment rendered in favor of the plaintiff. The plaintiff commenced foreclosure proceedings by means of service on the defendants on April 11, 2000.

On November 6, 2000, the defendants filed an amended motion to discharge the plaintiff's lien. See General Statutes § 49-35a (c). The defendants asserted three reasons that the lien should be discharged: (1) the services and materials provided by the plaintiff were not subject to a lien pursuant to § 49-33, (2) the certificate of lien was not served on the owners of the premises and (3) the lien service was not proper because the certificate that was served on the executrix was materially different from the certificate filed with the town clerk. Judge Brennan held a hearing on the amended motion to discharge the lien on February 5, 2001, and, in an oral ruling, denied the motion with respect to reasons one and three. Judge Brennan reserved decision as to whether the certificate of lien had been served on the owner properly. On May 14, 2001, Judge Brennan held a second hearing on the motion to determine whether Farrace or someone rightly acting on his behalf had agreed to have the work performed by the plaintiff. By memorandum of decision dated May 30, 2001, Judge Brennan denied the amended motion to discharge as to the issue of service.

Subsequently, the defendants filed a second amended motion to discharge, asserting the three original reasons plus two additional reasons why the lien should be discharged. Following a hearing held on December 3, 2001, Judge Thim ruled on the second amended motion to discharge by memorandum of decision filed February 13, 2002. He did not revisit the three original reasons to discharge, but denied the second amended motion to discharge, concluding that (1) Farrace had authorized the executrix to agree to the tank removal and remediation work, and that the executrix had agreed with the plaintiff for performance of all work, (2) the services performed were not done in violation of the Home Improvement Act and (3) they also were not performed in violation of the Home Solicitation Sales Act. The defendants appealed to this court.

Each of the defendants' claims requires us to construe various statutes and to apply them to the facts. We therefore set forth the applicable standard of review. "The process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Citation omitted; internal quotation marks omitted.) *State* v. *Courchesne*, 262 Conn. 537, 577, 816 A.2d 562 (2003) (en banc).

Statutory interpretation is a question of law and, thus, our review is plenary. *Gelinas* v. *West Hartford*, 65 Conn. App. 265, 275, 782 A.2d 679, cert. denied, 258

Conn. 926, 783 A.2d 1028 (2001). "[W]e must determine whether the court's conclusions are legally and logically correct and are supported by the record." (Internal quotation marks omitted.) *Dept. of Social Services* v. *Saunders*, 247 Conn. 686, 697, 724 A.2d 1093 (1999).

A mechanic's lien may be discharged pursuant to motion. General Statutes § 49-35b (a) provides in relevant part: "Upon the hearing held on the . . . motion set forth in section 49-35a, the lienor shall first be required to establish that there is probable cause to sustain the validity of his lien. Any person entitled to notice under section 49-35a may appear, be heard and prove by clear and convincing evidence that the validity of the lien should not be sustained or the amount of the lien claimed is excessive and should be reduced." See also *Pomarico* v. *Gary Construction, Inc.*, 5 Conn. App. 106, 111, 497 A.2d 70, cert. denied, 197 Conn. 816, 500 A.2d 1336 (1985).

I

We first address the defendants' claims that the court, *Brennan, J.*, in essence, improperly applied the statutory law of mechanic's liens to the facts. To resolve the defendants' claims, we must construe General Statutes §§ 49-33, 49-34 and 49-35 as they apply to the facts. Our construction of those statutes is informed again by our Supreme Court's guidance in *Courchesne*.

"The intent of the lawmakers is the soul of the statute, and the search for this intent we have held to be the guiding star of the court. It must prevail over the literal sense and the precise letter of the language of the statute. *Brown's Appeal*, 72 Conn. 148, 150, 44 [A.] 22 [1899]; *Stapleberg* v. *Stapleberg*, 77 Conn. 31, 35, 58 [A.] 233 [1904]; *Wetherell* v. *Hollister*, 73 Conn. 622, 625, 48 [A.] 826 [1901]. When one construction leads to public mischief which another construction will avoid, the latter is to be favored unless the terms of the statute absolutely

forbid. Sutherland on Statutory Construction [Ed. 1891] § 323; *Balch* v. *Chaffee*, 73 Conn. 318, 320, 47 [A.] 327 [1900]. A statute should be construed, having in view the nature and reason of the remedy and the object of the statute, in order to give effect to the legislative intent. *Newton's Appeal*, 84 Conn. 234, 241, 79 [A.] 742 [1911] . . . ." (Internal quotation marks omitted.) *State* v. *Courchesne*, supra, 262 Conn. 575–76.

"The guidelines for interpreting mechanic's lien legislation are well established. Although the mechanic's lien statute creates a statutory right in derogation of the common law . . . its provisions should be liberally construed in order to implement its remedial purpose of furnishing security for one who provides services or materials. . . . Our interpretation, however, may not depart from reasonable compliance with the specific terms of the statute under the guise of a liberal construction." (Citations omitted; internal quotation marks omitted.) *Ceci Bros., Inc.* v. *Five Twenty-One Corp.*, 51 Conn. App. 773, 777, 724 A.2d 541 (1999).

A

The defendants' first claim is that the court improperly determined that the removal of the tank and the remediation of the contaminated soil were services and materials within the construct of § 49-33. We disagree and conclude that the claim is controlled by our Supreme Court's decision in *Balch* v. *Chaffee*, supra, 73 Conn. 318.

Section 49-33 (a) provides in relevant part: "If any person has a claim for more than ten dollars for *materials furnished* or *services rendered* in the construction, raising, *removal* or repairs *of any building or any of its appurtenances* . . . and the claim is by virtue of an agreement with or by consent of the owner of the land . . . *or of some person having authority from or rightfully acting for the owner in procuring the labor*

*or materials,* the building, with the land on which it stands . . . is subject to the payment of the claim." (Emphasis added.) General Statutes § 49-33. "The interpretation of the language of § 49-33 is an issue of law. . . . Questions of law are subject to de novo review." (Citation omitted; internal quotation marks omitted.) *Ceci Bros., Inc.* v. *Five Twenty-One Corp.,* supra, 51 Conn. App. 776.

"Prior to the statute's amendment by the legislature in 1974, our cases construing the language of [§ 49-33] . . . required, as a condition of lienability, that the work done be incorporated in or utilized in the building (*or the appurtenance*) to be constructed, raised, removed or repaired. . . . Our other cases . . . consistently . . . insisted that mechanic's lien work be wrought into the liened property in some fashion. Thus the installation of fixtures that do not become part of the realty . . . or of electrical work that is not permanently attached to the realty . . . the removal of pipe from one building that is not incorporated into the building that is its replacement . . . and the furnishing of materials or equipment that is not shown to have gone into the construction or repair of a building . . . [were] all unalienable. *Balch* v. *Chaffee,* [supra, 73 Conn. 321], did hold lienable as an appurtenance the construction of an artesian well not physically connected to the house which it was to serve, but *Balch* v. *Chaffee,* supra, 320, describes the category of appurtenance as one of detached *structures* . . . and its holding, thus limited, is therefore consistent with the structural constraints that our other cases . . . uniformly imposed." (Citations omitted; emphasis added; internal quotation marks omitted.) *Thompson & Peck, Inc.* v. *Division Drywall, Inc.,* 241 Conn. 370, 376–77, 696 A.2d 326 (1997).

In *Balch* v. *Chaffee,* supra, 73 Conn. 318, our Supreme Court determined that an artesian well was an appurte-

nance pursuant to the mechanic's lien statute of the day.[3] Our Supreme Court's analysis of the term appurtenance pursuant to the statute and the facts of that case aptly apply to the facts at hand. To carry out the intent of the statute, "it is necessary to give the statute such a construction, if its terms are doubtful, as may serve to make mechanics' liens of some value. . . . The reference in the statute to the appurtenances of a building was plainly meant to cover what might not otherwise have been deemed to belong to it. It is an apt term to describe detached structures, built as adjuncts to a building, to further its convenient use and occupation. . . . Such was the well in question. The house would hardly have been habitable without it. That it was dug or bored in the soil below the natural surface of the house lot, does not render it any less a work of construction than a tank would be, built above ground and supplied by a force pump. Nor is it material that it was placed in the back yard rather than in the cellar; nor that it was not connected with a kitchen pump. It is also of no consequence that it was built after the house and under a separate and distinct contract. . . . The important inquiries are whether the house could be conveniently used without it, and whether it could be conveniently used except by those occupying the house. As to the latter point there can be no question that its main value lay in what it was worth to the tenants of that particular building." (Citations omitted.) Id., 320–21.

The tank the plaintiff's employees removed from the premises had been used to provide heating fuel to the building. Without heat, the building could not be used conveniently, and the tank was of no value to anyone

---

[3] "The design of the statute was to give to one who, by furnishing services or materials, under a contract with the owner of land, had added to its value by constructing a building upon it, or any appurtenances to a building, a substantial security for his proper remuneration. The lien which may be created is therefore made to embrace 'such land, building and appurtenances.' " *Balch* v. *Chaffee*, supra, 73 Conn. 320.

other than the tenants of the building. Furthermore, the tank was wrought into the liened property. It is the public policy of this state to eliminate soil and water pollution. See General Statutes § 22a-1. An entire regulatory system has been developed for the removal of soil contaminated by leaking fuel tanks. See General Statutes § 22a-449k. The court found that the tank was removed so that the premises could be sold. Selling the premises was something of value to the defendants' predecessors in title, the executrix and Peddle. See footnote 3.

In distinguishing certain services for which a lien may not be filed pursuant to § 49-33, our Supreme Court has defined the word mechanic. "A 'mechanic' is normally envisioned as a skilled worker who brings about a result by the use of tools, machines or equipment. See Random House Dictionary of the English Language (Unabridged Ed.)." *Nickel Mine Brook Associates* v. *Joseph E. Sakal, P.C.*, 217 Conn. 361, 368, 585 A.2d 1210 (1991). The services performed by the plaintiff here in removing the tank were mechanical in nature, requiring the services of individuals licensed in plumbing and heating.

For those reasons, the court properly determined that the services and materials rendered by the plaintiff were subject to a mechanic's lien pursuant to § 49-33.

B

The defendants' second claim is that the court, despite finding that the plaintiff had not served the owners of the property with a copy of the certificate of lien, improperly denied their motion to discharge the lien. Although the court determined that the plaintiff had not served the certificate of lien on the owners of the premises, the record before us does not support that determination. Nonetheless, we agree with the

court that the defendants failed to sustain their burden of proof to warrant the discharge of the lien.[4]

At the hearing on the amended motion to discharge the lien and on appeal, the defendants have argued that the plaintiff failed to comply with §§ 49-34 and 49-35, because it had not served the certificate of lien on each of the owners of the premises, i.e., the executrix and Peddle. General Statutes § 49-34 provides in relevant part: "A mechanic's lien is not valid, unless the person performing the services or furnishing the materials . . . (2) . . . serves a true and attested copy of the certificate upon the owner of the building, lot or plot of land *in the same manner as is provided for the service of the notice in section 49-35.*" (Emphasis added.) General Statutes § 49-35 (a) provides in relevant part: "No person . . . is entitled to claim any such mechanic's lien, unless . . . such person gives written notice to the owner of the building, lot or plot of land . . . . The notice shall be served upon the owner . . . . *When there are two or more owners . . . the notice shall be so served on each owner . . . .*" (Emphasis added.) The defendants also rely on *Papa* v. *Greenwich Green, Inc.,* 177 Conn. 295, 300–303, 416 A.2d 1196 (1979) (state, federal constitutional due process require that certificate of mechanic's lien must be served on all owners).

The court found that the plaintiff had failed to serve the certificate of lien on the owners of the premises whom it determined were the executrix and Peddle. The court, however, denied the motion to discharge on the ground that the defendants had offered no evidence that the executrix had filed a fiduciary's certificate in

---

[4] "Although we disagree with the trial court's reasoning, we affirm the court's judgment 'because it reached the right result, even if it did so for the wrong reason.' *Kalas* v. *Cook,* 70 Conn. App. 477, 485, 800 A.2d 553 (2002); see also *Flagg Energy Development Corp.* v. *General Motors Corp.,* 244 Conn. 126, 151, 709 A.2d 1075 (1998)." *Torringford Farms Assn., Inc.* v. *Torrington,* 75 Conn. App. 570, 571 n.2, 816 A.2d 736, cert. denied, 263 Conn. 924, 823 A.2d 1217 (2003).

the land records as required by General Statutes § 45a-322 (a) or that the Probate Court had published a notice to creditors pursuant to General Statutes § 45a-354. The court concluded that the defendants had failed to meet their burden that the lien should be discharged.

On appeal, the defendants note that the plaintiff served a copy of the lien certificate on the executrix only in her fiduciary capacity. They argue that the executrix in her fiduciary capacity did not own the premises; see *Ryder* v. *Lyon*, 85 Conn. 245, 252, 82 A. 573 (1912); and point out that "title to real estate vests immediately at death in a deceased's heirs, or in devisees upon the admission of the will to probate." *Cardillo* v. *Cardillo*, 27 Conn. App. 208, 212, 605 A.2d 576 (1992). The defendants conclude that the executrix and Peddle became the owners of the premises on the date Farrace died. Neither the facts nor the law support the defendants' conclusion.

The evidence in the record demonstrates that in January, 1999, at the time the plaintiff was providing its services, the premises were listed for sale. Farrace died in February, 1999. His will was admitted to probate on March 2, 1999. By executor's deed, the executrix conveyed the premises to Varga on April 22, 1999. We, however, do not know when the contract was entered into for the sale of the premises. Neither Judge Brennan nor Judge Thim made a finding of that fact, and pursuant to our plenary review, we found no evidence as to when the contract for the sale of the premises was entered into and by whom. The contract of sale may have been entered into before Farrace died, it may have been entered into before his will was admitted to probate or thereafter. If the contract of sale was entered into before Farrace died or before his will was admitted to probate, the executrix and Peddle never became the owners of the premises. There also is no evidence of when, or whether, a probate certificate of devise was recorded

in the land records. The defendants, therefore, have failed to prove by clear and convincing evidence that the lien is invalid because it was not served on the owners of the premises as required by § 49-35b.

"It is fundamental jurisprudence that title to real estate vests immediately at death in a deceased's heirs, or in devisees upon the admission of the will to probate. *Satti* v. *Rago*, 186 Conn. 360, 365, 441 A.2d 615 (1982); *O'Connor* v. *Chiascione*, 130 Conn. 304, 306–308, 33 A.2d 336 (1943). The recording of a probate certificate of devise or descent is necessary only to perfect marketable title. That certificate furnishes evidence that the heir's or devisee's title is no longer in danger of being cut off by a probate sale to pay debts of the estate and also because it furnishes a record of who received the title." *Cardillo* v. *Cardillo*, supra, 27 Conn. App. 212.

An heir is "[a] person who, under the laws of intestacy, is entitled to receive an intestate decedent's property, [especially] real property." Black's Law Dictionary (7th Ed. 1999). A devisee is "[a] recipient of property ([usually] real property) by will." Id.; see also *Starr* v. *Commissioner of Environmental Protection*, 236 Conn. 722, 737 n.17, 675 A.2d 430 (1996). Farrace died testate and devised the premises to the executrix and Peddle, who, therefore, were devisees and did not become owners of the premises, if at all, until Farrace's will was admitted to probate on March 2, 1999.

Furthermore, "[t]he estate of an owner of real estate under contract of sale, under the doctrine of equitable conversion, becomes in equity an estate in personalty and in case of his death before his contract is performed, or fully performed, the contract and the proceeds thereof are personal property or assets in the hands of his administrator or personal representative to be administered as the rest of his personal assets are administered." (Internal quotation marks omitted.)

*Pigeon* v. *Hatheway*, 156 Conn. 175, 177, 239 A.2d 523 (1968). We do not know when Varga entered into the contract to purchase the premises. If the contract was entered into before Farrace died, the executrix and Peddle never became the owners of the premises.

Because the defendants failed to sustain their burden of establishing by clear and convincing evidence that the certificate was not served on the owner of the premises and therefore that the lien was not valid, the court properly denied their amended motion to discharge the mechanic's lien.

C

The last of the defendants' claims as to Judge Brennan's rulings is that he improperly found that Farrace or someone rightfully acting on his behalf had agreed to pay for the materials and services provided.[5] The court's finding is supported by the evidence in the record.

"It is a general rule of law that the principal in a principal/agent relationship is only bound by, and liable for, the acts which his agent does with or within the actual or apparent authority from the principal, and within the scope of the agent's employment . . . . The nature and extent of an agent's authority is a question of fact for the trier." (Citations omitted; internal quotation marks omitted.) *Newtown Associates* v. *Northeast Structures, Inc.*, 15 Conn. App. 633, 637–38, 546 A.2d 310 (1988).

"The standard of review with respect to a court's findings of fact is the clearly erroneous standard. The

---

[5] In their appellate brief, the defendants attribute that finding to Judge Brennan. To rule on the fourth and fifth reasons to discharge the lien, Judge Thim also had to make that factual determination. Both Judge Brennan and Judge Thim found that Alexander Skultety rightfully had entered into the contract for remedial work on behalf of the owner of the premises.

trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . ." (Internal quotation marks omitted.) *Putnam Park Associates* v. *Fahnestock & Co.*, 73 Conn. App. 1, 11–12, 807 A.2d 991 (2002).

"Apparent authority is that semblance of authority which a principal, through his own acts or inadvertences, causes or allows third persons to believe his agent possesses. . . . Apparent authority thus must be determined by the acts of the principal rather than by the acts of the agent. . . . Furthermore, the party seeking to impose liability upon the principal must demonstrate that it acted in good faith based upon the actions or inadvertences of the principal." (Citations omitted; internal quotation marks omitted.) *Newtown Associates* v. *Northeast Structures, Inc.*, supra, 15 Conn. App. 638–39.

As previously stated, after the plaintiff's employees had removed the tank from the ground, they discovered that the tank had leaked fuel oil into the surrounding soil. On January 20, 1999, Alexander Skultety met with an agent of the plaintiff, and signed a time and materials agreement for the remediation of the contaminated soil. The defendants claim that Alexander Skultety was without authority to enter into the agreement on behalf of the owner of the premises. Judge Brennan found that Alexander Skultety went to the premises to meet a representative of the plaintiff at the behest of the executrix. He also found that that evening, Alexander Skultety

had a conversation with the executrix, who ratified his acts.

Judge Thim found that on January 15, 1999, the executrix signed an addendum to the agreement to remove the tank. The addendum stated: "Removal and disposal of contaminated fill if encountered shall constitute an extra charge. If after the tank has been removed and it is determined that an environmental problem exists, such as contaminated soil, oil or gasoline is in the grave, the cost to remediate the environmental problem will be considered an extra charge." The tank was removed and the soil was found to be contaminated. Alexander Skultety signed as "buyer" a document, wherein the plaintiff proposed to furnish the materials and labor, at prices set forth in the document, that were made necessary due to the tank's having leaked. Judge Thim also found that the executrix was aware that the remediation work was being done.

On the basis of our review of the transcript of the hearings, we conclude that the findings of Judge Brennan and Judge Thim are not clearly erroneous.[6] At the

---

[6] The transcript discloses that the executrix testified in relevant part as follows on May 14, 2001, before Judge Brennan:

"[Plaintiff's Counsel]: Okay. Can you tell us how you came to sign what is in evidence as exhibit one? How did this document and the services on this, how did those come to be?

"[The Witness]: We needed to have the tank removed and a new one put in the garage at my parents' house at 71 Lloyd Drive.

"[Plaintiff's Counsel]: Okay. When you say 'we' needed to do this, who is we?

"[The Witness]: I was power of attorney for my father, so I asked, since we needed . . . because of the sale of the house, they wanted the tank removed and the installation of a new one in the garage.

"[Plaintiff's Counsel]: All right. And what sale of the house was in the works at that time? Was it listed already?

"[The Witness]: It was listed.

\* \* \*

"[Plaintiff's Counsel]: Sure. Mr. Skultety brought this document to you, you saw it at some point after he signed it. Is that correct?

"[The Witness]: Yes.

"[Plaintiff's Counsel]: Did you voice any objection to him that he shouldn't

time the executrix, who was then acting under a power

have signed the document?

"[The Witness]: I voiced a concern about the amount, the price list, I'm going to call it a price list.

"[Plaintiff's Counsel]: But you had no objection to him having signed the work to get it done so you could sell the property.

"[The Witness]: I didn't know that he was going to be signing anything.

"[Plaintiff's Counsel]: All right. But once he signed it, did you object to him having signed it?

"[The Witness]: I don't think we had that discussion.

"[Plaintiff's Counsel]: All right.

"The Court: You didn't make any calls to [the plaintiff] to tell [it] not to go ahead with the remediation, did you?

"[The Witness]: No. I didn't.

"[Plaintiff's Counsel]: Your quarrel with . . . if any, was more with the price as to what it would cost and the fact that the work had to be done. Is that a fair statement?

"[The Witness]: Yes.

"[Plaintiff's Counsel]: There is no question in your mind, as you knew it, that an oil tank had leaked, is that correct?

"[The Witness]: Right.

"[Plaintiff's Counsel]: And that it had to be remediated or the buyers of the property wouldn't buy the house. Is that correct?

"[The Witness]: That would be correct.

"[Plaintiff's Counsel]: And how is it that Mr. Skultety came to sign this document and, or, obtain the proposal? Do you know?

"[The Witness]: I was unable to take the day off from school because I had taken several off because of my father's health. And so I asked my husband, Alex, to be there; he had a key to the house in case they needed to get into the house for any reason.

\* \* \*

"[Plaintiff's Counsel]: Is it your claim, Mrs. Skultety, that the estate of Joseph Farrace does not owe [the plaintiff] or its subsidiaries for this debt? Yes or no?

"[The Witness]: I do believe that they performed the service. I don't think that is what we are disputing.

"[Plaintiff's Counsel]: All right, well, why don't you tell me what you think it is you are disputing.

"[The Witness]: Our concern is the amount of the service.

\* \* \*

"The Court: No, let me put it this way. Are you claiming that the reason that this debt is not payable is because Mr. Skultety signed the papers and you didn't?

"[The Witness]: Well, I believe I'm the power of attorney, so . . . .

"The Court: Yeah. Okay. And you didn't.

"[The Witness]: No. I didn't.

of attorney for Farrace, signed the agreement for the removal of the tank, she signed an addendum concerning contaminated soil. At the time that the plaintiff's employees had determined that the soil was contaminated, the executrix made a decision, despite her fiduciary responsibilities, not to meet with the representative of the plaintiff to discuss the remediation, but asked her husband, Alexander Skultety, to go in her stead. She knew that the contaminated soil had to be removed to sell the premises. She discussed the plaintiff's time and materials agreement with her husband, and had concerns about the cost of the remediation, which could not be determined until the process

"The Court: And you knew about it the same day that he signed the papers, right?

"[The Witness]: I believe he said he signed something that night. I don't think we discussed that as much as we discussed the price list. I'm going to call it the price lists.

"The Court: That he signed. That is what he signed, was the price list. What is sitting in front of you marked exhibit two. Right?

"[The Witness]: Yes.

"The Court: And you discussed that, and you expressed concerns about it.

"[The Witness]: About the price list, yes.

"The Court: Did you call [the plaintiff] and tell [it], '[D]o not go forward with this work'?

"[The Witness]: No.

"The Court: Why?

"[The Witness]: I don't recall. I knew the work had to be done. There wasn't a final number. There was a price list, but there was not a final number.

"The Court: And did you call [the plaintiff] and tell [it that it] had to give you a final number before [it] could go forward with the work?

"[The Witness]: No. I didn't.

"The Court: And why is it you say this bill is not payable?

"[The Witness]: Well, I think I just stated that, Your Honor, I was concerned about the amount. The amount seemed over and above . . . I believe something that my husband discussed with [the plaintiff's representative] when he asked him, '[W]ell, can you give me an idea?' I think my husband would be able to state those numbers more clearly. But are we talking about three, are we talking about five, are we talking about nine? . . . There was no definite amount."

The plaintiff presented evidence that because the extent of the soil contamination could not be ascertained at the time the agreement was entered into, it had to proceed on a time and materials basis.

was undertaken. The executrix never instructed the plaintiff's agents that she did not want the remediation services and materials to be provided. She permitted the remediation to be completed and never objected until she received the plaintiff's statement. The court, therefore, properly denied the motion to discharge.

## II

We now turn to the defendants' claims that in denying their second amended motion to discharge the mechanic's lien, the court, *Thim, J.*, improperly construed (1) the Home Improvement Act, General Statutes § 20-418 et seq., and (2) the Home Solicitation Sales Act, General Statutes § 42-134a et seq., with regard to home solicitation sales, to the facts in issue. We disagree with the defendants' claims.

Again, because we are called on to apply the language of statutes to the facts, our review is plenary. *Gelinas* v. *West Hartford*, supra, 65 Conn. App. 275.

## A

The defendants claim that the court improperly determined that the agreement between the plaintiff and the executrix was exempt from the Home Improvement Act pursuant to § 20-428 (4) of that legislation. We do not agree.

In their second amended motion to discharge the mechanic's lien, the defendants claimed that the agreement between the plaintiff and the executrix was not enforceable under the Home Improvement Act. The plaintiff countered that it was exempt from the legislation because some of its employees hold professional licenses. The court found that an owner, a manager and persons employed by the plaintiff held current and unlimited contractor licenses for heating, cooling, piping and plumbing work. Two of the license numbers are set forth on the first page of the agreement signed

by the executrix on January 15, 1999. The licenses were issued pursuant to chapter 393 of the General Statutes, and the services performed on the premises were of the kind that holders of such licenses are authorized to perform. Several of the plaintiff's employees who provided services possessed limited heating and plumbing licenses. The court concluded that a licensed contractor was responsible for the services provided on the premises and, therefore, the Home Improvement Act did not apply to the agreement.

General Statutes § 20-428 provides in relevant part: "This chapter shall not apply to any of the following persons or organizations . . . (4) any person holding a current professional or occupational license issued pursuant to the general statutes . . . provided such person engages only in that work for which such person is licensed or registered." Under the Home Improvement Act the word person "means an individual, partnership, limited liability company or corporation." General Statutes § 20-419 (7).

On appeal, the defendants claim that there was no evidence that any licensed contractor performed any of the services on the premises. Our plenary review of the transcript demonstrates that the court's findings were not clearly erroneous. The defendants also take issue with the court's conclusion that a licensed contractor who was responsible for the services provided satisfies the exemption. This court previously has concluded that "General Statutes § 20-337, which is also a component of title 20 dealing with the licensing of plumbers, [solar, heating, piping and cooling] makes it clear that the ownership of a business that provides the services of licensed persons need not be in the control of a licensed person. . . . If [a company's] employees are licensed plumbers, [the company] is considered licensed also for purposes of § 20-428 (4).

"The purpose of the [Home Improvement Act] is to ensure that home improvements are performed by qualified people. That purpose will not be subverted by allowing businesses with a corporate structure that hire licensed plumbers for the performance of their plumbing work to be exempt from the necessity of a written contract." *Avon Plumbing & Heating Co.* v. *Fey*, 40 Conn. App. 351, 358, 670 A.2d 1318 (1996); see also *O'Donnell* v. *Rindfleisch*, 13 Conn. App. 194, 202–204, 535 A.2d 824 (licensed contractor responsible for services of unlicensed employees), cert. denied, 207 Conn. 805, 540 A.2d 373 (1988).

For the foregoing reasons, the court properly concluded that the plaintiff was exempt from the dictates of the Home Improvement Act.

B

The last of the defendants' claims is that the court improperly determined that the transaction in question was exempt from the Home Solicitation Sales Act, § 42-134a et seq. The defendants' claim lacks merit.

In their second amended motion to discharge the mechanic's lien, the defendants asserted that the documents relied on by the plaintiff were unenforceable because they violated the Home Solicitation Sales Act, in particular General Statutes § 42-135a. The court determined that the agreement between the plaintiff and the executrix was excluded from the terms of that legislation pursuant to the exclusions set forth therein.

General Statutes § 42-134a (a) provides in relevant part: " 'Home solicitation sale' means a sale, lease, or rental of consumer goods or services, whether under single or multiple contracts, in which the seller or his representative personally solicits the sale, including those in response to or following an invitation by the buyer, and the buyer's agreement or offer to purchase

is made at a place other than the place of business of the seller. The term 'home solicitation sale' does not include a transaction . . . (4) in which the buyer has initiated the contact and specifically requested the seller to visit his home for the purpose of repairing or performing maintenance upon the buyer's personal property. If in the course of such a visit, the seller sells the buyer the right to receive additional services or goods other than replacement parts necessarily used in performing the maintenance or in making the repairs, the sale of those additional goods or services shall not come within this exclusion . . . ."

On the basis of our plenary review of the record, we conclude that the evidence supports the court's findings and conclusion. The executrix requested that the plaintiff install a new oil tank in the garage and remove the old tank from the ground to facilitate the sale of the premises. The addendum to the agreement signed on January 15, 1999, contemplates the need to remediate any contaminated soil that might be found after the tank was removed from the ground. The labor and materials therefore needed to remove the contaminated soil were within the scope of the original request of the executrix.

For all of the foregoing reasons, we conclude that the defendants' amended motion and second amended motion to discharge the mechanic's lien on the premises were denied properly.

The orders denying the defendants' motions to discharge the plaintiff's mechanic's lien are affirmed.

In this opinion the other judges concurred.